UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
HARMEETINDER BASSI, M.D.,

         *Plaintiff*,

    *v.*

NEW YORK MEDICAL COLLEGE, PHELPS
MEMORIAL HOSPITAL ASSOCIATION d/b/a
PHELPS HOSPITAL, NORTHWELL HEALTH, INC.,
OPEN DOOR FAMILY MEDICAL CENTER, INC.
d/b/a OPEN DOOR FAMILY MEDICAL GROUP,
and SHANTIE HARKISOON, M.D.,

       *Defendants*.
-------------------------------------------------------------X

:      Civil Action
:      No.  19-cv-7542
:
:
:      **COMPLAINT**
:
:      **Jury Trial Requested**
:

Plaintiff Harmeetinder Bassi, M.D. ("Plaintiff" or "Dr. Bassi"), by his attorneys Basso & Khare LLC and the Law Offices of Joshua Parkhurst, as and for his complaint against Defendants New York Medical College ("NYMC"), Phelps Memorial Hospital Association d/b/a Phelps Hospital ("Phelps"), Northwell Health, Inc. ("Northwell"), Open Door Family Medical Center, Inc. d/b/a Open Door Family Medical Group ("Open Door"), and Shantie Harkisoon, M.D. ("Dr. Harkisoon") (collectively "Defendants"), alleges as follows:

## NATURE OF ACTION

1.      On June 30, 2017, Dr. Bassi was terminated from his employment as a medical resident in the Phelps Family Medicine Resident Program (the "Program"), a partnership jointly administered by the Defendants, because of his religion and because he had complained to human resources about discriminatory conduct by Dr. Harkisoon, the Program Director, and the Program's core faculty, relating to his need to wear religious head covering.  Dr. Bassi is a practicing Sikh and wearing an appropriate head covering in public is a tenet of his faith.

2.    The Program's actions were the culmination of a continuous pattern of discriminatory and retaliatory acts against Dr. Bassi, which escalated following his complaints in January 2016.  Dr. Harkisoon and her colleagues comprising the Program's core faculty placed him on Remediation in February 2016; singled him out for unfair scrutiny; withheld his promotion to third year of residency in June 2016 and required him to repeat second year; threatened to fire him at the end of December 2016 and again in May 2017; video-recorded his patient encounters; placed him on academic probation; directed that he repeat his second year of residency for a third time; and withheld academic credit for family medicine rotations he had successfully completed.  Non-Sikh medical residents, whose job performance was on par with or worse than Dr. Bassi's, were not subjected to the same unfair scrutiny or consequences.

3.    Though the Program's core faculty was hostile toward Dr. Bassi, doctors who supervised his rotations and who worked with him closely on high-acuity cases consistently evaluated him highly.  Additionally, following a review of Dr. Bassi's performance record, an internal Appeals Committee twice overturned his expulsion from the Program.  Yet, he was ultimately constructively discharged from employment on or about October 9, 2017 after the Program's core faculty maintained that he could only return to his residency under conditions so onerous and intolerable that no doctor in his position could accept them.

4.    Plaintiff brings this action for money damages and other relief to remedy discrimination on the basis of religion in the terms, conditions, and privileges of his employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the New York State Human Rights Law, N.Y. Executive Law § 290 *et seq.* ("NYSHRL").  He further brings this action to remedy the

retaliation he encountered after complaining of religion discrimination, leading to the termination of his employment in violation of Title VII, the Civil Rights Act of 1866, and the NYSHRL.

5.      As a result of the above violations, Plaintiff seeks injunctive and declaratory relief, compensatory and punitive damages, attorney's fees and costs, and any other appropriate legal and equitable remedies available under Title VII, 42 U.S.C. § 1988, and the NYSHRL.

**JURISDICTION, VENUE,
AND ADMINISTRATIVE EXHAUSTION**

6.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(4), and 42 U.S.C. § 2000e-5(f)(3).  The Court has supplemental jurisdiction of Plaintiff's pendant state claims pursuant to 28 U.S.C. § 1367(a).

7.      Venue in the Southern District of New York is appropriate under 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 2000e-5(f)(3) because all acts and events material to Plaintiff's claims occurred therein.

8.      Venue in the Southern District of New York is further appropriate under 28 U.S.C. § 1391(b)(1) as Defendants NYMC, Phelps, Open Door, and Dr. Harkisoon reside therein and all Defendants are located in the State of New York.

9.      On January 31, 2018, Dr. Bassi timely filed a Charge of Discrimination against the Defendants with the United States Equal Employment Opportunity Commission (EEOC) in which he alleged violations of Title VII.

10.      On or about May 14, 2019, the EEOC issued Dr. Bassi three (3) Notices of Right to Sue, as against NYMC, Phelps, and Northwell, for violations of Title VII.  On or about July 12, 2019, the EEOC issued Dr. Bassi a Notice of Right to Sue as against Open Door for violation of Title VII.

## PARTIES

11.     Plaintiff Harmeetinder Bassi, M.D. is a citizen of the United States, residing at 22 North Road, Warren, New Jersey 07059.

12.     Defendant New York Medical College is a New York not-for-profit corporation located at Administration Building, Sunshine Cottage, Valhalla, New York 10595 in Westchester County.

13.     NYMC was the sponsoring institution of the Program at the time Dr. Bassi was hired in 2014 until in or about July 2017.

14.     Defendant Phelps Memorial Hospital Association d/b/a Phelps Hospital is a New York not-for-profit corporation located at 701 North Broadway, Sleepy Hollow, New York 10591 in Westchester County.

15.     Phelps was the hospital that hosted the Program, including many of the faculty members and departments among which residents rotated to gain experience in practice areas comprising family medicine.

16.     Defendant Northwell Health, Inc. is a New York not-for-profit corporation with a principal place of business located at 2000 Marcus Avenue, New Hyde Park, New York 11042 in Nassau County.

17.     In or about January 2015, Phelps became a part of Northwell's network of hospitals, previously known as the North Shore-LIJ Health System.

18.     In or about July 2017, Northwell took over NYMC's role as sponsoring institution of the Program and was the sponsoring institution at the time of Dr. Bassi's final ouster from the Program in October 2017.

4

19.     Defendant Open Door Family Medical Center, Inc. d/b/a Open Door Family Medical Group is a New York not-for-profit corporation with a principal place of business located at 165 Main Street, Ossining, New York 10562 in Westchester County.

20.     Open Door operates a network of walk-in clinics across Westchester County. Residents in the Program undertake ambulatory care training at the Open Door clinic in Sleepy Hollow, New York.

21.     The Program is a partnership.  From its inception in 2012 until in or about July 2017, the Program was jointly administered by NYMC, Phelps, and Open Door.  From in or about July 2017 to the present date, the Program has been jointly administered by Northwell, Phelps, and Open Door.

22.     At all times relevant to this complaint, Defendant Shantie Harkisoon, M.D. was and is the Program Director, responsible for overseeing and administering the Program.

23.     On information and belief, Dr. Harkisoon resides in Westchester County, New York.

24.     Defendants NYMC, Northwell, Phelps, and Open Door all controlled the terms and conditions of Plaintiff's employment and were responsible for and/or ratified the unlawful employment practices complained of herein.  They are each therefore an "employer" under Title VII and the NYSHRL.

25.     Defendant Harkisoon was personally involved in perpetrating and/or aiding and abetting the unlawful employment practices complained of herein.  She is therefore an "employer" under the NYSHRL.

## FACTUAL ALLEGATIONS

26.     Dr. Bassi graduated from Aureus University School of Medicine, located in Aruba, in February 2014 as a Doctor of Medicine with the intention of specializing in family medicine.

27.     Dr. Bassi applied for and was accepted into the three-year Program at Phelps for the postgraduate-year ("PGY") beginning in fall 2014.

28.     The Program exposes residents to a diverse range of practice areas within family medicine, including obstetrics and gynecology, sports medicine, geriatric care, and cardiology, among others.  As part of the Program, residents complete twelve (12) four-week rotations per PGY among the practice areas at Phelps in accordance with the Program curriculum.

29.     Residents also spend an increasing number of hours each PGY at the Open Door clinic in Sleepy Hollow.  First-year residents must complete one (1) four-hour shift at Open Door each week; second-year residents must complete either one (1) eight-hour shift or two (2) four-hour shifts at Open Door each week; and third-year residents must complete one (1) twelve-hour shift or three (3) four-hour shifts each week.

30.     Residents must meet several quantitative requirements to complete the Program, including a set number of live births, clinic hours, and "on call" hours, among others.

31.     Residents of the Program must also successfully pass the National In-Training Examination (a.k.a. "In-Service Exam") in family medicine.  Residents sit for practice exams and actual exams each year with the expectation that one's score will improve over the course of residency.  The Program factors residents' scores on the In-Training Examination into whether to promote them from PGY-2 to PGY-3 and ultimately whether to allow them to graduate.

32.     The Program is accredited by the Accreditation Council for Graduate Medical Education ("ACGME"), which promulgates strict guidelines for the administration of residency programs in family medicine.

33.     ACGME's guidelines impose curriculum requirements as well as rules for how residents should be supervised and evaluated fairly.

34.     During Dr. Bassi's three years as a resident, the Program was headed by Dr. Harkisoon, the Program Director.

35.     Dr. Harkisoon was not Dr. Bassi's direct supervisor, but she served as the attending physician supervising some of his shifts at Open Door, and she monitored Dr. Bassi's overall performance in the Program.

36.     Although family medicine rotations and electives generally occurred at Phelps under the supervision of an assigned attending physician(s) per rotation, the Program's core faculty was based at Open Door.

37.     A Clinical Competency Committee ("CCC"), composed of the Program Director and the Program's core faculty, supervises the residents and compiles their evaluations from their four-week family medicine rotations as well as from data concerning patient volume, procedure logs, attendance records, and other metrics relevant to their completion of the Program.

**DR. BASSI'S EMPLOYMENT IN THE PROGRAM**

38.     Dr. Bassi was accepted into the Program for the first-year resident class beginning on July 1, 2014, under a contract dated March 25, 2014, covering the terms of his employment for the 2014-15 postgraduate year (i.e., "PGY-1").

39.     Dr. Bassi was one of eight (8) incoming residents for the 2014-15 PGY.

40.     After completing requisite foundational training during the first four (4) weeks of the Program, Dr. Bassi commenced his required four-week family medicine rotations and four-hour weekly shifts at Open Door.

41.     Dr. Bassi successfully completed all PGY-1 requirements and received a renewal contract for the second year of his residency (i.e., "PGY-2"), which commenced on July 1, 2015.

42.     As a PGY-2, Dr. Bassi continued to fulfill all programmatic requirements and earned positive evaluations from the attending physicians in his PGY-2 rotations.

43.     For example, Dr. Monique Forsea, the faculty member who observed Dr. Bassi in his internal medicine rotation in November and December 2015 rated him as "exceeds expectations" on all metrics.

44.     In addition, Dr. Kevin Brown ("Dr. Brown"), who served as Dr. Bassi's attending physician on two (2) emergency medicine rotations, first in January and February 2016 and then again in December 2016 and January 2017, rated him as "exceeds expectations" and at times "outstanding" on the various metrics.

**MISTREATMENT OF DR. BASSI AND TERMINATION OF EMPLOYMENT**

45.     Despite his success in the various family medicine rotations where he was spending the majority of his time, Dr. Bassi was subjected to unwarranted criticism and scrutiny during his shifts at Open Door.

46.     At the beginning of PGY-2, the feedback Dr. Bassi was receiving from the Program's core faculty at Open Door was on par with that received by his peers in the Program, but the evaluations he received from Dr. Harkisoon were especially harsh.

8

47.     As the year progressed, Dr. Harkisoon's evaluations and those of other core faculty grew hypercritical; by contrast, the evaluations he received for his rotations at the hospital remained steadily positive.

48.     Notably, though Dr. Bassi's performance at Open Door was on par with other non-Sikh residents, he was routinely scrutinized, but they were not.

49.     On or about January 21, 2016, Dr. Bassi was informed by one of the two Chief Residents, Thomas Chattathil ("Dr. Chattathil"), that the Program's core faculty believed his performance as a resident was unsatisfactory.

50.     In that same conversation, Dr. Chattathil mentioned that members of the Program's core faculty said that Dr. Bassi looked unprofessional in his religious head covering and had instructed him to confront Dr. Bassi about it.

51.     Dr. Chattathil was referring to a layer of cloth worn underneath Dr. Bassi's turban known as a "Patka," which covers his head and secures his hair.

52.     As a tenet of their religion, practicing Sikhs must keep their heads covered in public.  Though there is some variation in style and practice within the Sikh faith, adult men will typically wear a turban in public, but not when they sleep in the privacy of their own homes.

53.     A challenge arose for Dr. Bassi during his residency when he was required to spend overnights "on call" in the hospital.  On these shifts, residents are allowed to sleep unless a patient emergency arises or when a patient needs to be admitted from the emergency department to the hospital.

54.     When sleeping at the hospital and thus in public, Dr. Bassi's practice was to remove his turban while leaving in place his Patka.

9

55.     Dr. Chattathil's criticism referred to Dr. Bassi having been seen in his Patka as opposed to a full turban during his overnight shifts.

56.     Immediately after the conversation with Dr. Chattathil, Dr. Bassi confronted the other Chief Resident, Molly Kilpatrick ("Dr. Kilpatrick").  Dr. Kilpatrick confirmed that the Program faculty's comments about Dr. Bassi's religious head covering were made.

57.     On or about January 22, 2016, Dr. Bassi complained to the human resources department at both Phelps and Open Door that the Program's core faculty's comments were discriminatory and unacceptable, given that wearing a religious head covering in public is a tenet of his faith.

58.     Dr. Bassi also informed his academic advisor, Dr. Mary Rose Puthiyamadam ("Dr. Puthiyamadam"), who is a member of the Program's core faculty, about the discriminatory comments and that he had complained.

59.     During a conversation that occurred at Open Door, Dr. Puthiyamadam criticized Dr. Bassi for complaining and said he had "just made things worse" for himself.

60.     On or about January 28, 2016, Dr. Bassi attended a meeting with human resources representatives from Phelps and Open Door as well as Dr. Harkisoon and Dr. Chattathil.

61.     Dr. Harkisoon apologized to Dr. Bassi and admitted that the Program's core faculty had concerns about his religious headwear.

62.     When Dr. Bassi asked Dr. Harkisoon why she asked Dr. Chattathil to speak with him, instead of speaking to him directly, Dr. Harkisoon explained that she felt the message would come across better from a peer and compared Dr. Bassi's scenario to needing to confront someone with a body odor problem.

63.     Immediately after this incident and between February 2016 through summer 2017, Dr. Harkisoon and the Program's core faculty engaged in a series of adverse employment actions that impeded Dr. Bassi's residency and ultimately led to his discharge from the Program.

64.     These adverse employment actions lacked substantive justification and those that impacted the renewal, or threatened non-renewal, of his employment contract were in violation of policies and procedures set forth in ACGME guidelines and the Program's handbook.

65.     On or about February 12, 2016, three (3) weeks after he complained about the offensive comments, Dr. Bassi was placed on Remediation, and the Program threatened him with further consequences, including formal probation and termination of his employment at the conclusion of the PGY on June 30, 2016 unless he complied with the terms of Remediation.

66.     Remediation entailed adherence to a strict performance improvement plan, detailed in writing and overseen by Dr. Harkisoon and the Program's core faculty.

67.     From the time Dr. Bassi was placed on Remediation through his ultimate ouster from the Program, the Program's core faculty, based at Open Door, subjected Dr. Bassi to unwarranted, harsh, and often inconsistent, scrutiny of his patient encounters at Open Door compared to non-Sikh residents and those who had not complained of discrimination.

68.     In one instance, Dr. Bassi encountered a patient at Open Door with concussion-like symptoms.  The supervising physician, known as a "preceptor," castigated Dr. Bassi for not knowing about a concussion "score" system for evaluating patients.  A few weeks later, Dr. Bassi observed that same preceptor calmly and professionally teach another resident about concussion scoring during a similar patient encounter.

69.     On several occasions, preceptors scolded Dr. Bassi for taking a moment to research what medication to prescribe for a given patient's condition instead of prescribing

appropriate medications from memory.  By contrast, the preceptors encouraged other residents to take their time and research medications before determining an appropriate prescription.

70.     In reviewing Dr. Bassi's performance, the Program's core faculty gave undue weight to Dr. Bassi's performance in his Open Door shifts.  At the same time, they discounted nearly all evaluations of his performance in the family medicine rotations at Phelps though Dr. Bassi was required to spend the vast majority of his time in these rotations and was receiving largely positive evaluations from his supervisors there.

71.     Unlike the patients Dr. Bassi encountered at Open Door's ambulatory clinic, the patients Dr. Bassi handled on some of his rotations—including internal medicine, emergency medicine, and surgery—were high-acuity cases involving traumas, intubations, and other invasive medical procedures.

72.     On or about June 17, 2016, the Program sent Dr. Bassi a "Notice of Termination," stating that he was not being promoted to his third year of residency ("PGY-3"), which would have commenced July 1, 2016.  The Notice also said that the Program was continuing his PGY-2 contract for six (6) months under a probationary plan, and that his employment would be terminated effective December 31, 2016 unless the Program's core faculty deemed him compliant with the plan.

73.     Under ACGME guidelines and the Program's handbook, the Program needed to have informed Dr. Bassi months earlier of its decision to ensure sufficient notice and an opportunity to have his concerns reviewed in a timely manner.

74.     In August 2016, Dr. Bassi challenged the Program's decision not to promote him to PGY-3 and its threatened termination of his employment on December 31, 2016.

75.     An Appeals Committee, comprised of three (3) doctors who worked at Phelps in different family medicine practice areas and who were not considered part of the Program's core faculty, reviewed the Program's decision.

76.     On or about November 23, 2016, the Appeals Committee determined that the termination of Dr. Bassi's employment was unwarranted and that he should continue repeating his second year of residency.

77.     On or about December 19, 2016, the Program's core faculty informed Dr. Bassi that they accepted the Appeals Committee's decision, but that Dr. Bassi would remain on Remediation.  The Program further stated that Dr. Bassi was on notice of termination effective June 30, 2017 unless the Program's core faculty deemed him compliant with the terms of the Remediation plan.

78.     Around this same time period, the Program began video-recording Dr. Bassi's patient encounters at Open Door.  Being video-recorded while treating patients caused stress and discomfort for Dr. Bassi, but he nevertheless performed his job duties satisfactorily and met all legitimate job-related expectations.

79.     The video-recording of Dr. Bassi was not to provide constructive feedback or objectively monitor his performance, but designed to compile a dossier with which to criticize his performance.  None of the Program's core faculty ever reviewed the video-recorded patient encounters with Dr. Bassi, so that he could learn from them.

80.     Notwithstanding the intense pressure Dr. Bassi was experiencing under the Program's core faculty at Open Door, he studied for and received the highest grade in the fall 2016 In-Training Examination among all the Program's residents.

81.     Yet, on April 21, 2017, Dr. Harkisoon verbally notified Dr. Bassi that he would not be hired as a PGY-3 and was being fired effective May 8, 2017.

82.     Under the Program's handbook, termination decisions must be in writing.

83.     Dr. Bassi immediately challenged the improprieties of the Program's decision, including the lack of appropriate due process and notice required under ACGME guidelines and the Program's handbook, and the Program temporarily withdrew its termination decision.

84.     The Program afforded Dr. Bassi an opportunity to address the Clinical Competency Committee on May 19, 2017 and June 2, 2017.  In both meetings, Dr. Bassi urged the CCC to allow him to continue and complete his residency.

85.     By letter dated June 9, 2017, Dr. Harkisoon again informed Dr. Bassi that his employment was being terminated effective June 30, 2017, the end of the postgraduate year.

86.     Via letter dated June 16, 2019, Dr. Bassi notified the Program that he was appealing the termination decision.

**APPEALS COMMITTEE'S REVERSAL**
**FOLLOWED BY CONSTRUCTIVE DISCHARGE FROM THE PROGRAM**

87.     On July 27, 2017, Dr. Bassi again addressed the Appeals Committee, which was comprised of the same panel of doctors from the previous appeal in 2016, and challenged the Program's decision to fire him.

88.     On August 9, 2017, the Appeals Committee issued a unanimous decision, again overturning the Program's decision to terminate Dr. Bassi's residency.

89.     In its decision, the Appeals Committee directed that Dr. Bassi should be reinstated to the Program and allowed to complete any outstanding rotations needed to finish his training under supervision by other clinical faculty.

90.     Although the Appeals Committee's decision to overturn his termination was dated August 9, 2017, the Program waited three (3) weeks before telling him that he was being reinstated via a notice dated August 30, 2017.

91.     The Program's notice said that Dr. Bassi was being reinstated as a PGY-2, in other words, repeating the second year of residency for a <u>third</u> time.  The notice also stated that Dr. Bassi was being placed on four (4) months of academic probation and a performance plan, under which he would continue to be subjected to exacting scrutiny by core faculty.

92.     The Appeals Committee's decision included none of the terms or conditions contained in the Program's notice.

93.     On September 8, 2017, Dr. Bassi sent a letter to the Program demanding a meeting to discuss fair terms of reinstatement, including being reinstated as a PGY-3 without any probationary period.  Dr. Bassi also stated that if the Program could not meet his demands, then the Program should take affirmative steps to allow him to transfer to a new residency program.

94.     On September 13, 2017, Dr. Bassi received a letter from Dr. Karen Murray ("Dr. Murray"), the Chair of the Graduate Medical Education Committee who at that time worked at Open Door, stating that the Program stood by the conditions imposed on his reinstatement.

95.     After several exchanges with Dr. Bassi, Dr. Murray divulged that the reason Dr. Bassi could not return as a PGY-3 was because he lacked significant PGY-2 academic credit on his transcript.

96.     Dr. Murray shared with Dr. Bassi documentation of his academic credit, and much to his dismay, he learned for the first time that the Program had been withholding academic credits for rotations he had successfully completed.

97. A comparison of his evaluations from other family medicine rotations revealed in multiple instances that Dr. Bassi's supervising attending physicians gave him satisfactory evaluations, but the Program, without any explanation, was declining to give Dr. Bassi academic credit. Other residents who received similar evaluations on these rotations were awarded academic credit.

98. Besides impeding Dr. Bassi's advancement within the Program, the withholding of credit undermined his candidacy as a transfer resident to any new program.

99. On October 6, 2017, Dr. Bassi wrote to Dr. Murray a final time, stating that if the Program did not lift its punitive conditions on his reinstatement then the Program was constructively discharging him.

100. Dr. Murray responded that Program stood by the conditions, and as a result, Dr. Bassi was in fact constructively discharged or about October 9, 2017.

101. The Program's conditions were so unfair and so objectionable, such that no reasonable doctor in his position could accept them.

102. No reasonable doctor in Dr. Bassi's position would agree to repeat PGY-2 (for a third time) and return to the Program, where the Program Director and core faculty had demonstrated an inability to evaluate his progress fairly, had a history of compiling a record to justify ousting him, had withheld academic credit for rotations that were successfully completed, and had imposed conditions on continuing employment that were not part of the decision of the Appeals Committee.

103. As a result of the Program's actions, Dr. Bassi has been unable to obtain a medical license and resume his career as a practicing physician.

16

104.     Given that the Program escalated its scrutiny of Dr. Bassi's performance and began taking actions to end his residency within weeks of his complaining about religious discrimination—and given that the Program was not seeking to oust non-Sikh residents whose performance was on par with or worse than his—the Program's actions were motivated by discriminatory or retaliatory bias.

105.     Had Dr. Bassi not been discriminated against, and had he not complained of discrimination, the Program would have allowed him to finish his residency.

106.     That the Appeals Committee twice unanimously overturned the Program Director's and core faculty's decisions concerning his employment demonstrates that the Program's professional assessments of Dr. Bassi were not backed by fair judgment and that the Program was allowing discriminatory or retaliatory bias to affect decisions concerning his residency.

107.     The Program's withholding of Dr. Bassi's academic credit for rotations he successfully completed, without any explicable justification, supports the contention that the Program was intentionally seeking to thwart Dr. Bassi's career in medicine.

### CLAIMS FOR RELIEF AGAINST
### AGAINST ALL DEFENDANTS

### COUNT I:
### 42 U.S.C. § 1981 ("Civil Rights Act of 1866 ")

108.     Plaintiff incorporates paragraphs 1 through 107 of this Complaint as if such paragraphs were fully set forth herein.

109.     Defendants have purposefully and intentionally discriminated against Dr. Bassi on the basis of his race/color (South Asian/Punjabi) and/or religion (Sikh) as a proxy for race, in violation of the Civil Rights Act of 1866 by denying him the same terms and conditions of

employment available to all medical residents who are not South Asian/Punjabi and/or Sikh, including but not limited to subjecting him to harsh and unwarranted scrutiny, placing him on Remediation and academic probation, failing and refusing to promote him to the third year of residency ("PGY-3"), withholding academic credit, terminating his employment as a medical resident, reinstating him with punitive conditions, and ultimately constructively discharging him from the Program because of his race/color and/or religion as a proxy for race.

110.    Defendants' actions also constitute unlawful retaliation under the Civil Rights Act of 1866 as they were taken to punish or otherwise injure Dr. Bassi for his having complained of discrimination on the basis of his race/color and/or religion as a proxy for race.

111.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered, is now suffering, and will continue to suffer monetary damages, including loss of income, benefits, and the financial benefits of practicing as a physician.

112.    As a further result, Plaintiff has sustained embarrassment, humiliation, and emotional distress, having been denied an opportunity to practice medicine after years of successful study and training.

113.    Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's protected rights under the Civil Rights Act of 1866.

## COUNT II:
## New York State Human Rights Law, N.Y. Executive Law § 290 *et seq.*

114.    Plaintiff incorporates paragraphs 1 through 113 of this Complaint as if such paragraphs were fully set forth herein.

115.    During the course of Plaintiff's employment, Defendants, by and through their agents and employees, discriminated against Plaintiff as to the terms, conditions, and privileges of employment because of his religion in violation of the NYSHRL.

116.    Defendants, by and through their agents and employees, purposefully and intentionally subjected Dr. Bassi to harsh and unwarranted scrutiny, placed him on Remediation and academic probation, failed and refused to promote him to PGY-3, withheld academic credit, terminated his employment, reinstated him with punitive conditions, and ultimately constructive discharged him from the Program, among other adverse actions, because of his religion.

117.    Defendants' actions also constitute unlawful retaliation under the NYSHRL, as they were taken to punish or otherwise injure Dr. Bassi for his having complained of discrimination on the basis of his religion.

118.    There was a causal connection between Plaintiff's complaints of religious discrimination and Defendants' adverse actions taken against him.

119.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered, is now suffering, and will continue to suffer monetary damages, including loss of income, benefits, and the financial benefits of practicing as a physician.

120.    As a further result, Plaintiff has sustained embarrassment, humiliation, and emotional distress, having been denied an opportunity to practice medicine after years of successful study and training.

121.    Defendants acted with malice and/or reckless indifference to Dr. Bassi's statutorily protected rights under the NYSHRL.

## CLAIMS FOR RELIEF AGAINST
## DEFENDANTS NYMC, PHELPS, NORTHWELL, AND OPEN DOOR

### COUNT III:
### Title VII—Religious Discrimination

122.    Plaintiff incorporates paragraphs 1 through 121 of this Complaint as if such paragraphs were fully set forth herein.

123.    During the course of Plaintiff's employment, Defendants, by and through their agents and employees, discriminated against Plaintiff as to the terms, conditions, and privileges of employment, because of his religion, in violation of Title VII.

124.    Defendants, by and through their agents and employees, purposefully and intentionally subjected Dr. Bassi to harsh and unwarranted scrutiny, placed him on Remediation and academic probation, failed and refused to promote him to PGY-3, withheld academic credit, terminated his employment, reinstated him with punitive conditions, and ultimately constructive discharged him from the Program, among other adverse actions, because of his religion.

125.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered, is now suffering, and will continue to suffer monetary damages, including loss of income and benefits.

126.    As a further result, Plaintiff has sustained embarrassment, humiliation, and emotional distress, having been denied an opportunity to practice medicine after years of successful study and training.

127.    Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's protected rights under Title VII.

## COUNT IV:
### Title VII—Retaliation

128.    Plaintiff incorporates paragraphs 1 through 127 of this Complaint as if such paragraphs were fully set forth herein.

129.    Defendants, by and through their agents and employees, violated Title VII by unlawfully and willfully retaliating against Plaintiff by subjecting him to harsh and unwarranted scrutiny, placing him on Remediation and academic probation, failing and refusing to promote him to PGY-3, withholding academic credit, terminating his employment, reinstating him with

punitive conditions, and ultimately constructively discharging him from the Program, among other adverse actions, because of his complaining of religious discrimination.

130.    There was a causal connection between Plaintiff's complaints of religious discrimination and Defendants' adverse actions taken against him.

131.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered, is now suffering, and will continue to suffer monetary damages, including loss of income and benefits.

132.    As a further result, Plaintiff has sustained embarrassment, humiliation, and emotional distress, having been denied an opportunity to practice medicine after years of successful study and training.

133.    Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's protected rights under Title VII.

**CLAIMS FOR RELIEF AGAINST**
**DEFENDANT SHANTIE HARKISOON, M.D.**

**COUNT V:**
**42 U.S.C. § 1981 ("Civil Rights Act of 1866")**

134.    Plaintiff incorporates paragraphs 1 through 133 of this Complaint as if such paragraphs were fully set forth herein.

135.    Defendant Dr. Harkisoon has intentionally discriminated against Dr. Bassi on the basis of his race/color (South Asian/Punjabi) and/or religion as a proxy for race (Sikh) in violation of the Civil Rights Act of 1866.

136.    Dr. Harkisoon was personally involved in subjecting Dr. Bassi to harsh and unwarranted scrutiny as well as in the decisions to place him on Remediation and academic probation, to not promote him to PGY-3, to withhold academic credit, to terminate his

employment, to reinstate him with punitive conditions, and ultimately to constructively discharge him from the Program.

137.    Dr. Harkisoon's actions also constitute unlawful retaliation under the Civil Rights Act of 1866 as they were taking to punish or otherwise injure Dr. Bassi for his having complained of discrimination on the basis of his race/color and/or religion as a proxy for race.

138.    As a direct and proximate result of Dr. Harkisoon's actions, Plaintiff has suffered, is now suffering, and will continue to suffer monetary damages, including loss of income and benefits.

139.    As a further result, Plaintiff has sustained embarrassment, humiliation, and emotional distress, having been denied an opportunity to practice medicine after years of successful study and training.

140.    Dr. Harkisoon acted with malice and/or reckless indifference to Dr. Bassi's statutorily protected rights under the Civil Rights Act of 1866.

**COUNT VI:**
**Aiding and Abetting Discrimination on the Basis of Religion in Violation of**
**New York State Human Rights Law, N.Y. Executive Law § 290 _et seq._**

141.    Plaintiff incorporates paragraphs 1 through 140 of this Complaint as if such paragraphs were fully set forth herein.

142.    Defendant Dr. Harkisoon has intentionally discriminated against Dr. Bassi on the basis of his religion in violation of the NYSHRL.

143.    Among other adverse employment actions, Dr. Harkisoon aided and abetted the Program's discrimination against Dr. Bassi on the basis of his religion by subjecting him to harsh and unwarranted scrutiny, placing him on Remediation and academic probation, failing and refusing to promote him to PGY-3, withholding academic credit, terminating his employment,

reinstating him with punitive conditions, and ultimately constructively discharging him from the Program.

144.     Dr. Harkisoon's actions also constitute unlawful retaliation under the NYSHRL as they were taken to punish or otherwise injure Dr. Bassi for his having complained of discrimination on the basis of his religion.

145.     As a direct and proximate result of Dr. Harkisoon's actions, Plaintiff has suffered, is now suffering, and will continue to suffer monetary damages, including loss of income and benefits.

146.     As a further result, Plaintiff has sustained embarrassment, humiliation, and emotional distress, having been denied an opportunity to practice medicine after years of successful study and training.

147.     Dr. Harkisoon acted with malice and/or reckless indifference to Dr. Bassi's statutorily protected rights under the NYSHRL.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court exercise jurisdiction of his claims and award him:

a)  Appropriate injunctive relief, including but not limited to reinstatement as a third-year medical resident, academic credit for all rotations performed, and an order restraining Defendants from engaging in further discriminatory or retaliatory conduct of the types Plaintiff has complained herein;

b)  Back pay, wages, and other lost employee benefits in amounts to be determined at trial;

c)  In the event reinstatement is not granted, front pay;

d) Additional compensatory and consequential damages against Defendants, including for emotional distress;

e) Pre-judgment and post-judgment interest at the highest lawful rate;

f) Reasonable attorney's fees and costs incurred in the prosecution of this action;

g) Punitive damages for Defendants' acting with actual malice and wanton and willful disregard for Plaintiff's statutorily protected rights; and

h) Such other legal and equitable relief as this Court deems appropriate and just.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury determination of all issues so triable.

Respectfully submitted,

/s/ *Peter A. Basso*

Peter A. Basso
BASSO & KHARE LLC
17 State Street, Ste. 4000
New York, NY 10004
Phone:  (201) 620-6720
Fax:  (201) 620-6720
E-mail:  peter@bassokhare.com

/s/ *Joshua Parkhurst*

Joshua Parkhurst
LAW OFFICES OF JOSHUA PARKHURST
11 Broadway, Suite 615
New York, NY 10004
Phone:  (201) 577-2644
Fax:  (212) 480-8560
E-mail:  jparkhurst@parkhurstlawfirm.com

*Co-counsel for Plaintiff Harmeetinder Bassi, M.D.*

Dated:  August 12, 2019