UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

HARMEETINDER BASSI,                                                                  19 Civ. 07542

      *Plaintiff*,                     :                ***CIVIL ACTION***

                                      :

      *v.*                                **FIRST AMENDED COMPLAINT**

                                  :         **AND JURY DEMAND**

NEW YORK MEDICAL COLLEGE, PHELPS
MEMORIAL HOSPITAL ASSOCIATION d/b/a
PHELPS HOSPITAL, NORTHWELL HEALTH, INC.,
OPEN DOOR FAMILY MEDICAL CENTER, INC.
d/b/a OPEN DOOR FAMILY MEDICAL GROUP,
and DR. SHANTIE HARKISOON,

                                      :

      *Defendants*.

-------------------------------------------------------------------X

## COMPLAINT

Plaintiff Harmeetinder Bassi ("Plaintiff" or "Dr. Bassi"), by his attorneys the Law Offices of Joshua Parkhurst, as and for his complaint against Defendants New York Medical College ("NYMC"), Phelps Memorial Hospital Association d/b/a Phelps Hospital ("Phelps"), Northwell Health Inc. ("Northwell"), Open Door Family Medical Center, Inc. d/b/a Open Door Family Medical Group ("Open Door"), and Dr. Shantie Harkisoon ("Dr. Harkisoon") (collectively "Defendants"), alleges as follows:

## NATURE OF ACTION

1.      On June 30, 2017 Dr. Bassi was terminated from his employment as a medical resident in the Phelps Family Medicine Resident Program (the "Program"), a partnership jointly administered by the Defendants, because of his religion and because he had complained to human resources about discriminatory conduct by Dr. Harkisoon, the Program Director, and core faculty relating to his need to wear religious head covering. Dr. Bassi is a practicing Sikh and wearing an appropriate head covering in public is a tenet of his faith.

2.     The Program's actions were the culmination of continuous pattern of discriminatory and retaliatory acts against Dr. Bassi, which escalated following his complaints in January 2016. Dr. Harkisoon and her colleagues comprising the Program's core faculty placed him on Remediation in February 2016; singled him out for unfair scrutiny; withheld his promotion to third year of residency in June 2016 and required him to repeat second year; threatened to fire him at the end of December 2016 and again in May 2017; video-surveilled his patient encounters; placed him on academic probation; directed that he repeat his second year of residency for a third time; and withheld academic credit for rotations he had successfully completed. Non-Sikh medical residents, whose job performance was on par with or worse than Dr. Bassi's, were not subjected to the same unfair scrutiny or consequences.

3.     Though the Program's core faculty was hostile toward Dr. Bassi, doctors who supervised his rotations and who worked with him closely on high-acuity cases consistently evaluated him highly. Additionally, following a review of Dr. Bassi's performance record, an internal Appeals Committee twice overturned his expulsion from the Program. Yet, he was ultimately constructively discharged from employment on or about October 9, 2017 after the Program's core faculty maintained that he could only return to his residency under conditions so onerous and intolerable that no doctor in his position could accept them.

4.     In addition, Defendants' actions against Dr. Bassi violated several provisions of the residency agreement between Dr. Bassi, Phelps, and New York Medical College as well as applicable provisions of the resident handbook and guidelines of the Accreditation Council for Graduate Medical Education ("ACGME") which are incorporated into and made a part of the residency agreement. Defendant Harkisoon, and other agents of Defendants, unlawfully induced

violations of the residency agreement in order to render Dr. Bassi's contractual rights, and his ability to receive redress for violations of those rights, meaningless.

5.    Plaintiff brings this action for money damages and other relief to remedy discrimination on the basis of religion in the terms, conditions, and privileges of his employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Civil Rights Act of 1866, 42 U.S.C. § 1981 *et seq.,* and the New York State Human Rights Law, N.Y. Executive Law § 290 *et seq.* ("NYSHRL"). He further brings this action to remedy the retaliation he encountered after complaining of religion discrimination, leading to the termination of his employment in violation of Title VII, the Civil Rights Act of 1866, and the NYSHRL.

6.    As a result of the above violations, Plaintiff seeks injunctive and declaratory relief, compensatory, punitive, and liquidated damages, attorney's fees and costs and any other appropriate legal and equitable remedies available under Title VII, 42 U.S.C. § 1988, and the NYSHRL. Plaintiff further seeks appropriate remedies for common law breach of contract and tortious interference with contract.

## JURISDICTION, VENUE, AND ADMINISTRATIVE EXHAUSTION

7.    This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(4), and 42 U.S.C. § 2000e-5(f)(3). The Court has supplemental jurisdiction of Plaintiff's pendant state claims pursuant to 28 U.S.C. § 1367(a).

8.    Venue in the Southern District of New York is appropriate under 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 2000e-5(f)(3) because all acts and events material to Plaintiff's claims occurred therein.

9.      Venue in the Southern District of New York is further appropriate under 28 U.S.C. § 1391(b)(1) as Defendants NYMC, Phelps, Open Door, and Dr. Harkisoon reside therein and all Defendants are located in the State of New York.

10.     On January 31, 2018, Dr. Bassi timely filed a Charge of Discrimination against the Defendants with the Equal Employment Opportunity Commission (EEOC). in which he alleged violations of Title VII.

11.     On or about May 14, 2019, the EEOC issued Dr. Bassi three (3) Notices of Right to Sue, as against NYMC, Phelps, and Northwell, for violations of Title VII. On or about July 12, 2019, the EEOC issued Dr. Bassi a Notice of Right to Sue as against Open Door for violation of Title VII.

## PARTIES

12.     Plaintiff Harmeetinder Bassi is a citizen of the United States, residing at 22 North Road, Warren, New Jersey 07059.

13.     Defendant New York Medical College is a New York not-for-profit corporation located at Administration Building, Sunshine Cottage, Valhalla, New York 10595 in Westchester County.

14.     NYMC was the sponsoring institution of the Program at the time Dr. Bassi was hired in 2014 until in or about July 2017.

15.     Defendant Phelps Memorial Hospital Association d/b/a Phelps Hospital is a New York not-for-profit corporation located at 701 North Broadway, Sleepy Hollow, New York 10591 in Westchester County.

16.    Phelps was the hospital that hosted the Program, including many of the faculty members and departments among which residents rotated to gain experience in practice areas comprising family medicine.

17.    Defendant Northwell Health, Inc. is a New York not-for-profit corporation with a principal place of business located at 2000 Marcus Avenue, New Hyde Park, New York 11042 in Nassau County.

18.    In or about January 2015, Phelps became a part of Northwell's network of hospitals, previously known as the North Shore-LIJ Health System.

19.    In or about July 2017, Northwell took over NYMC's role as sponsoring institution of the Program and was the sponsoring institution at the time of Dr. Bassi's final ouster from the Program in October 2017.

20.    Defendant Open Door Family Medical Center, Inc. d/b/a Open Door Family Medical Group is a New York not-for-profit corporation with a principal place of business located at 165 Main Street, Ossining, New York 10562 in Westchester County.

21.    Open Door operates a network of walk-in clinics across Westchester County. Residents in the Program undertake ambulatory care training at the Open Door clinic in Sleepy Hollow, New York.

22.    The Program is a partnership. From its inception in 2012 until in or about July 2017, the Program was jointly administered by NYMC, Phelps, and Open Door. From in or about July 2017 to the present date, the Program has been jointly administered by Northwell, Phelps, and Open Door.

23.    At all times relevant to this complaint, Defendant Dr. Shantie Harkisoon was and is the Program Director, responsible for overseeing and administering the Program.

24.    On information and belief, Dr. Harkisoon resides in Westchester County, New York.

25.    Defendants NYMC, Northwell, Phelps, and Open Door all controlled the terms and conditions of Plaintiff's employment and were responsible for and/or ratified the unlawful employment practices complained of herein. They are each therefore an "employer" under Title VII and the NYSHRL.

26.    Defendant Harkisoon was personally involved in perpetrating and/or aided and abetted the unlawful employment practices complained of herein. She is therefore an "employer" under the NYSHRL.

## FACTUAL ALLEGATIONS

27.    Dr. Bassi graduated from Aureus University School of Medicine, located in Aruba, in February 2014 as a Doctor of Medicine with the intention of specializing in family medicine.

28.    Dr. Bassi applied for and was accepted into the three-year Program at Phelps for the postgraduate-year ("PG-Y") beginning in fall 2014.

29.    The Program exposes residents to a diverse range of specialties within family medicine, including obstetrics and gynecology, sports medicine, geriatric care, and cardiology, among others. As part of the Program, residents complete twelve (12) four-week rotations among specialties at Phelps per PGY in accordance with the Program curriculum.

30.    Residents also spend an increasing number of hours each postgraduate year at the Open Door clinic in Sleepy Hollow. First-year residents must complete one (1) four-hour shift at Open Door each week; second-year students must complete either one (1) eight-hour shift or two

(2) four-hour shifts at Open Door each week; and third-year residents must complete one (1) twelve-hour shift or three (3) four-hour shifts each week.

31.     Residents must meet several quantitative requirements to complete the Program, including a set number of live births, clinic hours, and "on call" hours, among others.

32.     Residents of the Program must also successfully pass the National In-Training Examination (a.k.a. "In-Service Exam") in family medicine.  Residents sit for practice exams and actual exams each year with the expectation that one's score will improve over the course of residency. The Program factors residents' scores on the In-Training Examination into whether to promote them from PGY-2 to PGY-3 and ultimately whether to allow them to graduate..

33.     The Program is accredited by the Accreditation Council for Graduate Medical Education ("ACGME"), which promulgated strict guidelines for the administration of residency programs in family medicine.

34.     ACGME's guidelines impose curriculum requirements as well as rules for how residents should be supervised and evaluated fairly.

35.     During Dr. Bassi's three years as a resident, the Program was headed by Program Director Dr. Shantie Harkisoon ("Dr. Harkisoon").

36.     Dr. Harkisoon was not Dr. Bassi's direct supervisor, but she served as the attending physician supervising some of his shifts at Open Door, and she monitored Dr. Bassi's overall performance in the Program.

37.     Although family medicine rotations and electives generally occurred at Phelps under the supervision of a assigned attending physician(s) per rotation, the Program faculty was based at Open Door.

38.     A Clinical Competency Committee ("CCC"), composed of the Program Director and the Program's core faculty, supervises the residents and compiles their evaluations from their four-week rotations and data concerning patient volume, procedure logs, attendance records, and other metrics relevant to their completion of the Program.

**D**R. **B**ASSI'S **E**MPLOYMENT IN THE **P**ROGRAM

39.     Dr. Bassi was accepted into the Program for the first-year resident class beginning on July 1, 2014, under a contract dated March 25, 2014, covering the terms of his employment for the 2014-15 postgraduate year (i.e., "PGY-1").

40.     The contract for Dr. Bassi's first year of residency ("Residency Contract") was signed by Dr. Bassi, defendant Harkisoon as the program director for the NYMC Phelps Family Medicine Residency Program, and Phelps, through its CEO Daniel Blum.

41.     Paragraph "1" of the Residency Contract provides that defendant Phelps agrees to provide a training program that meets the standards set by the ACGME for both residencies generally ("common requirements"), and for family medicine residencies specifically.

42.     Paragraph "2" of the Residency Contract provides that Dr. Bassi "shall provide services…in accordance with Hospital, Medical Staff, and Department By-laws, rules, regulations, policies, and procedures and delineation of privileges, as further provided in the Program's Policy and Procedures Manual ('Resident Handbook') as well as the Policy and Procedure Manuals of the Hospital, ODFMC [Open Door Family Medical Centers] and any other rotation sites."

43.     Paragraph "11" of the Residency Contract concerns Termination, Non-Renewal, and Non-Promotion. That paragraph provides that "disputes over the application, non-renewal, or termination of this agreement (or of the Hospital's intent to renew this Agreement but not

promote you to the next level of training) shall be handled in accordance with the grievance
procedure as set forth in the Resident Handbook. You shall have the right to appeal any adverse
decisions affecting your continuation in the program and are guaranteed due process."

44.    Dr. Bassi was one of eight (8) incoming residents for the 2014-15 postgraduate
year.

45.    After completing requisite foundational training during the first four (4) weeks of
the Program, Dr. Bassi commenced a series of required four-week rotations in family medicine
specialties and four-hour weekly shifts at Open Door.

46.    Dr. Bassi successfully completed all PGY-1 requirements and received a renewal
contract for the second year of his residency (i.e., "PGY-2"), which commenced on July 1, 2015.
The Residency Contract for Dr. Bassi's PGY-2 year contained provisions identical to the
provisions in his PGY-1 contract, including those cited in paragraphs "41" through "43."

47.    As a PGY-2, Dr. Bassi continued to fulfill all programmatic requirements and
earned positive evaluations from the attending physicians in his PGY-2 rotations.

48.    For example, Dr. Monique Forsea, the faculty member who observed Dr. Bassi in
his internal medicine rotation in November and December 2015 rated him as "exceeds
expectations" on all metrics.

49.    In addition, Dr. Kevin Brown ("Dr. Brown"), who served as Dr. Bassi's attending
physician on two (2) emergency medicine rotations, first in January and February 2016 and then
again in December 2016 and January 2017, rated him as "exceeds expectations" and at times
"outstanding" on the various metrics.

**MISTREATMENT OF DR. BASSI AND TERMINATION OF EMPLOYMENT**

50.     Despite his success in the various medical rotations where he was spending the majority of his time, Dr. Bassi was subjected to unwarranted criticism and scrutiny during his shifts at Open Door.

51.     At the beginning of PGY-2, the feedback Dr. Bassi was receiving from the Program's core faculty at Open Door was on par with that received by his peers in the Program, but the evaluations he received from Dr. Harkisoon were especially harsh.

52.     As the year progressed, Dr. Harkisoon's evaluations and those of other core faculty grew hypercritical; by contrast, the evaluations he received for his rotations at the hospital remained steadily positive.

53.     Notably, though Dr. Bassi's performance at Open Door was on par with other non-Sikh residents, he was routinely scrutinized, but they were not.

54.     On or about January 21, 2016, during a shift at Open Door, Dr. Bassi was informed by one of the two Chief Residents, Thomas Chattathil ("Dr. Chattathil"), that the Program's core faculty believed his performance as a resident was unsatisfactory.

55.     In that same conversation, Dr. Chattathil mentioned that members of the Program's core faculty said that Dr. Bassi looked unprofessional in his religious head covering and had instructed him to confront Dr. Bassi about it.

56.     Dr. Chattathil was referring to a layer of cloth worn underneath Dr. Bassi's turban known as a "Patka," which covers his head and secures his hair.

57.     As a tenet of their religion, practicing Sikhs must keep their heads covered in public. Though there is some variation in style and practice within the Sikh faith, adult men will typically wear a turban in public, but not when they sleep in the privacy of their own homes.

58.     A challenge arose for Dr. Bassi during his residency when he was required to spend overnights "on call" in the hospital. On these shifts, residents are allowed to sleep unless a patient emergency arises or when a patient needs to be admitted from the emergency department to the hospital.

59.     When sleeping at the hospital and thus in public, Dr. Bassi' practice was to remove his turban while leaving in place his Patka.

60.     Dr. Chattathil's criticism referred to Dr. Bassi having been seen in his Patka as opposed to a full turban during his overnight shifts.

61.     Immediately after the conversation with Dr. Chattathil, Dr. Bassi confronted the other Chief Resident Molly Kilpatrick ("Dr. Kilpatrick"). Dr. Kilpatrick confirmed that the Program faculty's comments about Dr. Bassi's religious head covering were made.

62.     On or about January 22, 2016, Dr. Bassi complained to the human resources department at both Phelps and Open Door that the Program's core faculty's comments were discriminatory and unacceptable, given that wearing a religious head covering in public is a tenet of his faith.

63.     Dr. Bassi also informed his academic advisor Dr. Mary Rose Puthiyamadam ("Dr. Puthiyamadam"), who is a member of the Program's core faculty, about the discriminatory comments and that he had complained.

64.     During a conversation that occurred at Open Door, Dr. Puthiyamadam criticized Dr. Bassi for complaining and said he had "just made things worse" for himself.

65.     On or about January 28, 2016, Dr. Bassi attended a meeting with human resources representatives from Phelps and Open Door as well as Dr. Harkisoon and Dr. Chattathil.

66.    Dr. Harkisoon apologized to Dr. Bassi and admitted that the Program's core faculty had concerns about his religious headwear.

67.    When Dr. Bassi asked Dr. Harkisoon why she asked Dr. Chattathil to speak with him, instead of speaking to him directly, Dr. Harkisoon explained that she felt the message would come across better coming from a peer and compared Dr. Bassi's scenario to needing to confront someone with a body odor problem.

68.    Immediately after this incident and between February 2016 through summer 2017, Dr. Harkisoon and core faculty engaged in a series of adverse employment actions that impeded Dr. Bassi's residency and ultimately led to his discharge from the Program.

69.    These adverse employment actions lacked substantive justification and those that impacted the renewal, or threatened non-renewal, of his employment contract were in violation of policies and procedures set forth in ACGME guidelines and the Program's handbook.

70.    On or about February 12, 2016, three (3) weeks after he complained about the offensive comments, Dr. Bassi was placed on Remediation, and the Program threatened him with further consequences, including formal probation and termination of his employment at the conclusion of the postgraduate year on June 30, 2016 unless he complied with the terms of Remediation.

71.    On or about June 17, 2016, the Program's core faculty sent Dr. Bassi a "Notice of Termination," which stated that he was not being promoted to his third year of residency ("PGY-3"), which would have commenced July 1, 2016. The Notice also said that the Program was continuing his PGY-2 contract for six (6) months under a probationary plan, and that his employment would be terminated effective December 31, 2016 unless the Program's core faculty deemed him compliant with the plan.

72.     Under the ACGME guidelines and the Program's policies and procedures, the
Program needed to have informed Dr. Bassi by February 1, 2016 of its decision to ensure
sufficient notice and an opportunity to have his concerns reviewed on appeal.

73.     The Program's core faculty, based at Open Door, subjected Dr. Bassi to
unwarranted, harsh, and often inconsistent, scrutiny of his patient encounters at Open Door
compared to non-Sikh residents and those who had not complained of discrimination.

74.     In one instance, Dr. Bassi encountered a patient at Open Door with concussion-
like symptoms. The supervising physician, known as a "preceptor," castigated Dr. Bassi for not
knowing about a concussion "score" system for evaluating patients. A few weeks later, Dr.
Bassi observed that same preceptor calmly and professionally teach another resident about
concussion scoring during a similar patient encounter.

75.     On several occasions, preceptors scolded Dr. Bassi for taking a moment to
research what medication to prescribe for a given patient's condition instead of prescribing
appropriate medications from memory. By contrast, the preceptors encouraged other residents to
take their time and research medications before determining an appropriate prescription.

76.     In reviewing Dr. Bassi's performance, the Program's core faculty gave undue
weight to Dr. Bassi's performance in his Open Door shifts. At the same time, they discounted
nearly all evaluations of his performance in the family medicine rotations at Phelps though Dr.
Bassi was required to spend the vast majority of his time in these rotations and was receiving
largely positive evaluations from his supervisors there.

77.     Unlike the patients Dr. Bassi encountered at Open Door's ambulatory clinic, the
patients Dr. Bassi handled on some of his rotations—including Internal Medicine, Emergency

Medicine, and Surgery—were high-acuity cases involving traumas, intubations, and other invasive medical procedures.

78.    In August 2016, Dr. Bassi challenged the Program's decision not to promote him to PGY-3 and its threatened termination of his employment on December 31, 2016.

79.    An Appeals Committee, comprised of three (3) doctors who worked at Phelps in family medicine specialties and who were not considered part of the Program's core faculty, reviewed the Program's decisions.

80.    On or about November 23, 2016, the Appeals Committee determined that the termination of Dr. Bassi's employment was unwarranted and that he should continue repeating his second year of residency.

81.    On or about December 19, 2016, the Program's core faculty informed Dr. Bassi that they accepted the Appeals Committee's decision, but that Dr. Bassi would remain on Remediation. The Program further stated that Dr. Bassi was on notice of termination effective June 30, 2017 unless the Program's core faculty deemed him compliant with the terms of the Remediation plan.

82.    Around this same time period, the Program began video recording Dr. Bassi's patient encounters at Open Door. Being video recorded while treating patients caused stress and discomfort for Dr. Bassi, but he nevertheless performed his job duties satisfactorily and met all legitimate job-related expectations.

83.    The video recording of Dr. Bassi was not to provide constructive feedback or objectively monitor his performance, but designed to compile a dossier with which to criticize his performance. None of the Program's core faculty ever reviewed the video-recorded patient encounters with Dr. Bassi, so that he could learn from them.

84.     Notwithstanding the intense pressure Dr. Bassi was experiencing under the

Program's core faculty at Open Door, he studied for and received the highest grade in the fall

2016 In-Training Examination among all the Program's residents.

85.     Yet, on April 21, 2017, the Program Director verbally notified Dr. Bassi that he

would not be hired as a PGY-3 and fired effective May 8, 2017.

86.     Under the Program's handbook, termination decisions must be in writing.

87.     In addition, pursuant to Section VIII of the Resident Handbook, the Program must

inform residents no later than February 1st that they will not be promoted to the next PGY year.

88.     Dr. Bassi immediately challenged the improprieties of the Program's decision,

including the lack of appropriate due process and notice required under ACGME guidelines and

the Program's handbook, and the Program temporarily withdrew its termination decision.

89.     The Program afforded Dr. Bassi an opportunity to address the Clinical

Competency Committee on May 19, 2017 and June 2, 2017. In both meetings, Dr. Bassi urged

the Program to allow him to continue and complete his residency.

90.     On June 9, 2017, the Program Director again informed Dr. Bassi that his

employment was being terminated effective June 30, 2017, the end of the postgraduate year.

91.     Via letter dated June 16, 2019, Dr. Bassi notified the Program that he was

appealing the termination decision.

**APPEALS COMMITTEE'S REVERSAL**
**FOLLOWED BY CONSTRUCTIVE DISCHARGE FROM THE PROGRAM.**

92.     On July 27, 2017, Dr. Bassi again addressed the Appeals Committee, which was

comprised of the same panel of doctors from the previous appeal in 2016, and challenged the

Program's core faculty's decision to terminate his residency.

93.     On August 9, 2017, the Appeals Committee issued a unanimous decision, again overturning the Program Director's decision to terminate Dr. Bassi's employment.

94.     Although the Appeals Committee's decision to overturn his termination was dated August 9, 2017, the Program waited three (3) weeks before telling him that he was being reinstated via a notice dated August 30, 2017.

95.     In its decision, the Appeals Committee originally directed that Dr. Bassi should be reinstated to the Program and allowed to complete any outstanding rotations needed to finish his training and that Defendants should do so "in a different environment, within the larger NYMC (New York Medical College) family, under supervision by different clinical faculty."

96.     Defendants received the decision before Dr. Bassi. Rather than promptly inform Dr. Bassi of the decision, Defendants improperly contacted the Appeals Committee *ex parte* to demand that they change their decision.

97.     Defendant Harkisson objected to the Appeals Committee decision, and attempted to send additional evidence, *ex parte*, to influence the Appeals Committee to change its decision.

98.     Upon information and belief, defendant NYMC, through its agents, contacted the Appeals Committee *ex parte* and claimed that Dr. Bassi would only be permitted to complete his residency at the Phelps program.

99.     Although the Appeals Committee refused to overturn its decision, it did, as a result of the *ex parte* communications with Harkisoon and NYMC, issue a new decision, backdated to August 9, 2017, removing the language "in a different environment, within the larger NYMC (New York Medical College) family." The Appeals Committee's decision still required that Dr, Bassi be allowed to complete his training, finish all outstanding rotations, and be supervised by different clinical faculty.

100.    The Program's August 30, 2017 notice, however, refused to fully implement the Appeals Committee Decision, even as modified as a result of improper *ex parte* communications, and instead stated that Dr. Bassi was being reinstated as a PGY-2 – in other words, he would be required to repeat his second year of residency for a <u>third</u> time. The notice also stated that Dr. Bassi was being placed on four (4) months of academic probation and a performance plan, under which he would continue to be subjected to exacting scrutiny by core faculty.

101.    The Appeals Committee's decision included none of the terms or conditions contained in the Program faculty's notice.

102.    On September 8, 2017, Dr. Bassi sent a letter to the Program demanding a meeting to discuss fair terms of reinstatement, including being reinstated as a PGY-3 without any probationary period. Dr. Bassi also stated that if the Program could not meet his demands, then the Program should take affirmative steps to allow him to transfer to a new residency program.

103.    On September 13, 2017, Dr. Bassi received a letter from Dr. Karen Murray ("Dr. Murray"), the Chair of the Graduate Medical Education Committee who at that time worked at Open Door, stating that the Program stood by the conditions imposed on his reinstatement.

104.    After several exchanges with Dr. Bassi, Dr. Murray divulged that the reason Dr. Bassi could not return as a PGY-3 was because he lacked significant PGY-2 academic credit on his transcript.

105.    Dr. Murray shared with Dr. Bassi documentation of his academic credit, and much to his dismay, he learned for the first time that Dr. Harkisoon had been withholding academic credits for rotations he had successfully completed.

106.    A comparison of his evaluations from other family medicine rotations revealed in multiple instances that Dr. Bassi's supervising attending physicians gave him satisfactory

evaluations, but the Program, without any explanation, was declining to give Dr. Bassi academic credit. Other residents who received similar evaluations on these rotations were awarded academic credit. For "Pass/Fail" rotations, the Program denied Dr. Bassi credit even for rotations that Dr. Bassi passed.

107.    In doing so, in addition to impeding Dr. Bassi's advancement within the Program, the withholding of credit undermined his candidacy as a transfer resident to any new program.

108.    On October 6, 2017, Dr. Bassi wrote to Dr. Murray a final time, stating that if the Program did not lift its punitive conditions on his reinstatement that the Program was constructively discharging him.

109.    Dr. Murray responded that Program stood by the conditions, and as a result, Dr. Bassi was in fact constructively discharged or about October 9, 2017.

110.    The Program's conditions were so unfair and so objectionable—by design— that no reasonable doctor in his position could accept them.

111.    No reasonable doctor in Dr. Bassi's position would agree to repeat PGY-2 (for a third time) and return to the Program, where the Program Director and core faculty had demonstrated an inability to evaluate his progress fairly, had a history of compiling a record to justify ousting him, had withheld credit for rotations that were successfully completed, and had imposed conditions on continuing employment that were not part of the decision of the Appeals Committee.

112.    As a result of the Program's actions, Dr. Bassi has been unable to obtain a medical license to resume his career as a practicing physician.

113.    Given that the Program escalated its scrutiny of Dr. Bassi's performance and began taking actions to end his residency within weeks of his complaining about religious

discrimination—and given that the Program was not seeking to oust non-Sikh residents whose performance was on par with his—the Program's actions were motivated by discriminatory or retaliatory bias.

114.    Had Dr. Bassi not been discriminated against, and had he not complained of discrimination, the Program would have allowed him to finish his residency.

115.    That the Appeals Committee twice unanimously overturned the Program Director's and core faculty's decisions concerning his employment demonstrates that the Program's professional assessments of Dr. Bassi were not backed by fair judgment and that Program's core faculty was allowing discriminatory or retaliatory bias to affect decisions concerning his residency.

116.    Dr. Harkisoon's withholding of Dr. Bassi's academic credit for rotations he successfully completed, without any explicable justification, supports the contention that the Program's core faculty was intentionally seeking to thwart Dr. Bassi's career in medicine.

117.    In addition, Dr. Bassi has learned that the American Board of Family Medicine, the entity that certifies Family Medicine practitioners, has, as of this date, records erroneously indicating that Dr. Bassi was "dismissed" from the Program, even though he was reinstated by the Appeals Committee. Such records are based on information supplied by defendant Harkisoon.

## CLAIMS FOR RELIEF AGAINST
## AGAINST ALL DEFENDANTS

### COUNT I:
### 42 U.S.C. § 1981 ("Civil Rights Act of 1866 ")

118.    Plaintiff incorporates paragraphs 1 through 117 of this Complaint as if such paragraphs were fully set forth herein.

119.    Defendants have intentionally discriminated against Dr. Bassi on the basis of his race/color (South Asian/Punjabi) and/or religion (Sikh) as a proxy for race, in violation of the Civil Rights Act of 1866 by denying him the same terms and conditions of employment available to all medical residents who are not South Asian/Punjabi and/or Sikh, including but not limited to, failing and refusing to promote him to the third year of residency ("PGY-3"), withholding academic credit, terminating his employment as a medical resident, reinstating him with punitive conditions, and ultimately constructively discharging him from the Program because of his race/color and/or religion as a proxy for race.

120.    Defendants' actions also constitute unlawful retaliation under the Civil Rights Act of 1866 as they were taken to punish or otherwise injure Dr. Bassi for his having complained of discrimination on the basis of his race/color and/or religion as a proxy for race.

121.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered, is now suffering, and will continue to suffer monetary damages, including loss of income, benefits, and the financial benefits of practicing as a physician.

122.    As a further result, Plaintiff has sustained embarrassment, humiliation, and emotional distress, having been denied an opportunity to practice medicine after years of successful study and training.

123.    Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's protected rights under the Civil Rights Act of 1866.

### COUNT II:
### New York State Human Rights Law, N.Y. Executive Law § 290 *et seq.*

124.    Plaintiff incorporates paragraphs 1 through 123 of this Complaint as if such paragraphs were fully set forth herein.

125.    During the course of Plaintiff's employment, Defendants, by and through their agents and employees, discriminated against Plaintiff as to the terms, conditions, and privileges of employment, because of his religion in violation of the NYSHRL.

126.    Defendants, by and through their agents and employees, purposefully and intentionally declined Plaintiff's promotion to PGY-3, placed him on academic probation and Remediation, subjected him to harsh and unwarranted scrutiny, video-surveilled his work, withheld academic credit, threatened the termination of his employment on several occasions, and ultimately constructive discharged him from the Program.

127.    Defendants' actions also constitute unlawful retaliation under the NYSHRL,, as they were taken to punish or otherwise injure Dr. Bassi for his having complained of discrimination on the basis of his religion.

128.    There was a causal connection between Plaintiff's complaints of religious discrimination and Defendants' adverse actions taken against him.

129.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered, is now suffering, and will continue to suffer monetary damages, including loss of income, benefits, and the financial benefits of practicing as a physician.

130.    As a further result, Plaintiff has sustained embarrassment, humiliation, and emotional distress, having been denied an opportunity to practice medicine after years of successful study and training.

131.    Defendants acted with malice and/or reckless indifference to Dr. Bassi's statutorily protected rights under the NYSHRL.

## CLAIMS FOR RELIEF AGAINST
## DEFENDANTS NYMC, PHELPS, NORTHWELL, AND OPEN DOOR

### COUNT III:
### Title VII—Religious Discrimination

132.    Plaintiff incorporates paragraphs 1 through 131 of this Complaint as if such paragraphs were fully set forth herein.

133.    During the course of Plaintiff's employment, Defendants, by and through their agents and employees, discriminated against Plaintiff as to the terms, conditions, and privileges of employment, because of his religion, in violation of Title VII.

134.    Defendants, by and through their agents and employees, purposefully and intentionally declined Plaintiff's promotion to PGY-3, placed him on academic probation and Remediation, subjected him to harsh and unwarranted scrutiny, video-surveilled his work, withheld academic credit, threatened the termination of his employment on several occasions, and ultimately constructively discharged him from the Program.

135.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered, is now suffering, and will continue to suffer monetary damages, including loss of income and benefits.

136.    As a further result, Plaintiff has sustained embarrassment, humiliation, and emotional distress, having been denied an opportunity to practice medicine after years of successful study and training.

137.    Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's protected rights under Title VII.

**COUNT IV:**
**Title VII—Retaliation**

138.    Plaintiff incorporates paragraphs 1 through 137 of this Complaint as if such paragraphs were fully set forth herein.

139.    Defendants, by and through their agents and employees, violated Title VII by unlawfully and willfully retaliating against Plaintiff by declining Plaintiff's promotion to PGY-3, placing him on academic probation and Remediation, subjecting him to harsh and unwarranted scrutiny, video-surveilling his work, withholding academic credit, threatening the termination of his employment on several occasions, and ultimately constructively discharging him from the Program, because of his complaining of religious discrimination.

140.    There was a causal connection between Plaintiff's complaints of religious discrimination and Defendants' adverse actions taken against him.

141.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered, is now suffering, and will continue to suffer monetary damages, including loss of income and benefits.

142.    As a further result, Plaintiff has sustained embarrassment, humiliation, and emotional distress, having been denied an opportunity to practice medicine after years of successful study and training.

143.    Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's protected rights under Title VII.

**CLAIMS FOR RELIEF AGAINST**
**DEFENDANT DR. SHANTIE HARKISOON**

**COUNT V:**
**42 U.S.C. § 1981 ("Civil Rights Act of 1866")**

144.    Plaintiff incorporates paragraphs 1 through 143 of this Complaint as if such paragraphs were fully set forth herein.

145.    Defendant Dr. Harkisoon has intentionally discriminated against Dr. Bassi on the basis of his race/color (South Asian/Punjabi) and/or religion as a proxy for race (Sikh) in violation of the Civil Rights Act of 1866.

146.    Dr. Harkisoon was personally involved in the decisions to deny Dr. Bassi's promotion to the third year of residency ("PGY-3"), to withhold academic credit, to terminate his employment as a medical resident, to reinstate him with punitive conditions, and ultimately to constructively discharge him from the Program.

147.    Dr. Harkisoon's actions also constitute unlawful retaliation under the Civil Rights Act of 1866 as they were taking to punish or otherwise injure Dr. Bassi for his having complained of discrimination on the basis of his race/color and/or religion as a proxy for race.

148.    As a direct and proximate result of Dr. Harkisoon's actions, Plaintiff has suffered, is now suffering, and will continue to suffer monetary damages, including loss of income and benefits.

149.    As a further result, Plaintiff has sustained embarrassment, humiliation, and emotional distress, having been denied an opportunity to practice medicine after years of successful study and training.

150.    Dr. Harkisoon acted with malice and/or reckless indifference to Dr. Bassi's statutorily protected rights under the Civil Rights Act of 1866.

24

**COUNT VI:**

**Aiding and Abetting Discrimination on the Basis of Religion in Violation of
New York State Human Rights Law, N.Y. Executive Law § 290 *et seq*.**

151.    Plaintiff incorporates paragraphs 1 through 150 of this Complaint as if such
paragraphs were fully set forth herein.

152.    Defendant Dr. Harkisoon has intentionally discriminated against Dr. Bassi on the
basis of his religion in violation of the NYSHRL, N.Y. Exec. Law § 296.

153.    Among other adverse employment actions, Dr. Harkisoon aided and abetted the
failure and refusal to promote Dr. Bassi to the third year of residency ("PGY-3"), the
withholding academic credit, the termination his employment as a medical resident, the decision
to reinstate him with punitive conditions, and ultimately his constructive discharge from the
Program.

154.    As a direct and proximate result of Dr. Harkisoon's actions, Plaintiff has suffered,
is now suffering, and will continue to suffer monetary damages, including loss of income and
benefits.

155.    As a further result, Plaintiff has sustained embarrassment, humiliation, and
emotional distress, having been denied an opportunity to practice medicine after years of
successful study and training.

156.    Dr. Harkisoon acted with malice and/or reckless indifference to Dr. Bassi's
statutorily protected rights under the NYSHRL.

## CLAIM FOR RELIEF AGAINST DEFENDANTS PHELPS AND NYMC

## COUNT VII -

## Breach of Contract

157.    Plaintiff incorporates paragraphs 1 through 156 of this Complaint as if such paragraphs were fully set forth herein.

158.    The terms and conditions of Plaintiff's residency were governed by the Residency Contracts agreed to by Plaintiff, Phelps, and NYMC.

159.    The Residency Contracts incorporated, *inter alia*, the ACGME guidelines and the Program's Resident Handbook.

160.    Defendants Phelps and NYMC breached the Residency Contracts by, among other things:

        a.    Failing to give Dr. Bassi timely notification of non-promotion.

        b.    Failing to give Dr. Bassi timely notification of non-renewal.

        c.    Withholding academic credit for rotations that Dr. Bassi successfully passed.

        d.    Denying Dr. Bassi due process with respect to his non-promotion, non-renewal, appeal, and receipt of academic credit.

        e.    Interfering with the deliberations and decision of the Appeals Committee.

        f.    Refusing to implement either the original or improperly modified decision of the Appeals Committee.

161.    Plaintiff has incurred damages for Defendants' breach of contract, including but not limited to incomplete training, inability to transfer to another program, denial of eligibility to

apply for a license to practice medicine, denial of eligibility for certification by the American

Board of Family Medicine, lost earnings and lost earnings potential.

### CLAIM FOR RELIEF AGAINST DEFENDANT NYMC

### COUNT VIII

### Tortious Interference With Contract

162.    Plaintiff incorporates paragraphs 1 through 161 of this Complaint as if such

paragraphs were fully set forth herein.

163.    Defendant NYMC (if found not to be party to the Residency Contract with

Plaintiff) was aware of Plaintiff's Residency Contract with Phelps.

164.    Defendant NYMC (if found not to be party to the Residency Contract with

Plaintiff), intentionally procured the breach of the Residency Contract with Phelps by, *inter*

*alia*, taking the actions in paragraph "160" above.

165.    Plaintiff has sustained damages from Defendant NYMC's interference with

Plaintiff's contract, including but not limited to incomplete training, inability to transfer to

another program, denial of eligibility to apply for a license to practice medicine, denial of

eligibility for certification by the American Board of Family Medicine, lost earnings, lost

earnings potential, mental anguish, humiliation, and damage to reputation.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court exercise jurisdiction of his

claims and award him:

a) Appropriate injunctive relief, including but not limited to reinstatement as third-year medical resident, academic credit for all rotations performed, and an order restraining Defendant from engaging in further discriminatory or retaliatory conduct of the types Plaintiff has complained herein;

b) Back pay, wages, and other lost employee benefits in amounts to be determined at trial;

c) In the event reinstatement is not granted, front pay;

d) Additional compensatory and consequential damages against Defendant, including for emotional distress;

e) Pre-judgment and post-judgment interest at the highest lawful rate;

f) Reasonable attorney's fees and costs incurred in the prosecution of this action;

g) Punitive damages for Defendant's acting with actual malice and wanton and willful disregard for Plaintiff's statutory and contract rights; and

h) Such other legal and equitable relief as this Court deems appropriate and just.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury determination of all issues so triable.

*Joshua Parkhurst*

_____
Joshua Parkhurst
LAW OFFICES OF JOSHUA PARKHURST

Dated: February 19, 2021

28