USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __3/2/2023__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HARMEETINDER BASSI, M.D.,

                              Plaintiff,

         -against-

NEW YORK MEDICAL COLLEGE, PHELPS
MEMORIAL HOSPITAL ASSOCIATION, d/b/a
PHELPS HOSPITAL, NORTHWELL HEALTH, INC.
d/b/a OPEN DOOR FAMILY MEDICAL GROUP,
and SHANTIE HARKISOON, M.D.,

                              Defendant.

---

No. 19 Civ. 7542 (NSR)

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge

Plaintiff Harmeetinder Bassi, M.D., ("Plaintiff" or "Dr. Bassi") commenced this action against Defendants New York Medical College ("NYMC"), Phelps Memorial Hospital Association, d/b/a Phelps Hospital ("Phelps"), Northwell Health, Inc. d/b/a Open Door Family Medical Group ("Open Door"), and Shantie Harkisoon, M.D., ("Dr. Harkisoon) (collectively, "Defendants"), asserting claims for workplace discrimination, retaliation, breach of contract, and tortious interference. (Amended Complaint ("Am. Compl."), ECF No. 61.)

Presently before the Court are (1) Open Door's motion for summary judgment (ECF No. 100), (2) Phelps's motion for summary judgment (ECF No. 104), (3) NYMC's motion for summary judgment (ECF No. 107), and (4) Plaintiff's cross-motion for partial summary judgment on its claims for breach of contract and tortious interference (ECF No. 111). For the following reasons, the Court GRANTS Defendants' motions for summary judgment, and the Court DENIES Plaintiff's cross-motion for summary judgment.

## BACKGROUND

### I.     Factual Background

The parties have submitted briefs, statements of material facts pursuant to Local Civil Rule 56.1, and the record and exhibits from discovery in the instant proceeding, which reflect the following factual background.

#### A.  The Family Medicine Residency Program

Dr. Bassi was a medical resident in the Family Medicine Residency Program (the "Program"). (Am. Compl. at ¶ 28.)  The Program was created on March 29, 2011 through an Affiliation Agreement between NYMC, Open Door, and Phelps.  (NYMC Statement of Undisputed Facts ("NYMC 56.1") at ¶ 2, ECF No. 110.)  NYMC was the Program's sponsoring institution and monitored the Program's compliance with accreditation standards set by the Accreditation Council for Graduate Medical Education ("ACGME").  (Open Door Statement of Undisputed Facts ("Open Door 56.1") at ¶¶ 1–2, ECF No. 101.)  Phelps employed Program administrators, including Program Director Dr. Harkisoon, provided financial support to the Program, and housed the majority of the Program's inpatient rotations.  (Phelps Statement of Undisputed Facts ("Phelps 56.1") at ¶ 3, ECF No. 106; Open Door 56.1 at ¶ 3.)  Open Door served as the Program's outpatient clinic and family health center.  (Open Door 56.1 at ¶ 9.)

The Program entails three years of residency requirements.  During the first year of the Program ("PGY-1"), residents are required to spend four hours per week at Open Door, completing one patient encounter per hour.  (*Id.* at ¶12.)  During the second year of the Program ("PGY-2"), residents are required to spend eight hours per week at Open Door, completing one patient encounter every thirty to forty-five minutes.  (*Id.* at ¶ 14.)  During the third and final year of the

Program ("PGY-3"), residents are required to spend twelve hours per week at Open Door, completing each patient encounter within thirty minutes or less.  (*Id.* at ¶ 16.)

Open Door physicians supervise, or "precept," residents in their patient interactions at the Clinic.  (Phelps 56.1 at ¶ 15.)  Some of these physicians are considered "Core Faculty," and they are involved in overseeing clinical performance, advising residents, and submitting summative evaluations to the Clinical Competency Committee ("CCC").  (Open Door 56.1 at ¶¶ 19–21; Plaintiff's Response to Open Door Statement of Undisputed Facts ("Plf. Resp. 56.1 Open Door") at ¶ 19, ECF No. 123.)  As required by ACGME guidelines, the Program chartered the CCC to evaluate resident performance.  (Phelps 56.1 at ¶ 30.)  The CCC is comprised of the Program Director, Core Faculty, and, at times, additional faculty members.  (*Id.* at ¶ 31; Plaintiff's Response to Phelps Statement of Undisputed Facts ("Plf. Resp. 56.1 Phelps") at ¶ 31, ECF No. 121.)

**B.  Dr. Bassi's Admission to the Program and PGY-1 Year (2014–15)**

Dr. Bassi practices Sikhism.  (Phelps 56.1 at ¶ 56.)  As part of his religious practice, Dr. Bassi covers his head when he is in public, including at all times during his residency.  (*Id.* at ¶¶ 57–58.)  Although Dr. Bassi always covers his head with a smaller garment called a patka, he often wears a turban over the patka.  (*Id.* at ¶ 57.)  For example, during his residency, Dr. Bassi often covered his patka with a turban.  (*Id.* at ¶ 60.)  He did so during his interview and during his time spent at the Clinic.  (*Id.* at ¶¶ 59–60.)  Sometimes Dr. Bassi would remove his turban and wear only his patka, such as when he would conduct surgeries, assist in newborn deliveries, or work overnight shifts.  (*Id.* at ¶ 61.)

Dr. Bassi joined the Program on July 1, 2014, pursuant to a one-year employment contract (the "Contract") subject to renewal in successive years.  (First Declaration of Harmeetinder Bassi ("First Bassi Dec.") Ex. B, ECF No. 114.)  Both the original and renewed versions (*see* First Bassi

Dec. Ex. C) of the Contract state that "disputes over the application, non-renewal, or termination of this agreement (or of the Hospital's intent to renew this Agreement but not promote you to the next level of training) shall be handled in accordance with the grievance procedure as set forth in the Resident Handbook."  (Contract at ¶ 11.)  In the event of a dispute, a resident retains "the right to appeal any adverse decisions affecting [their] continuation in the program" and is "guaranteed due process."  (*Id.*)

The Contract incorporates provisions from the Resident Handbook (the "Handbook") (Contract at ¶ 2), including provisions related to promotion and adverse decisions.  The Handbook "sets forth criteria for successful completion of rotations."  (Plf. Resp. 56.1 Phelps at ¶ 67.)  Where the Program denies a resident's promotion, the Handbook states as follows:

> Residents will be informed no later than February 1 if they are not going to be promoted to the next academic PGY level. After February 1, this promotion may be rescinded if the resident fails to meet the ACGME minimum training standards. In this event, the Program Director will make such recommendation to the GMEC, where a final decision will be made.

(First Bassi Dec. Ex. E., Sec. VIII.)  Where a resident fails "to meet minimum academic standards," the Program will provide "opportunities for remediation."  (*Id.* at Sec. VIII.4.)  Should the resident "fail[ ] to correct the identified academic deficiencies to the satisfaction of the program requirements within the specified time frame," the Program may either extend the remediation procedure or proceed with "probation and possible termination."  (*Id.*)

Dr. Bassi passed PGY-1.  Dr. Bassi's first performance evaluation was issued in October 2014.  (Affirmation of John P. Keil ("Keil Dec.") Ex. 6, ECF No. 109.)  At that time, Dr. Bassi's performance was "appropriate for [his] level of training," and he displayed a "positive attitude" and a "warm and caring disposition."  (*Id.*)  Dr. Bassi, however, lagged behind the required patient encounters for his level of training, did not log enough patient encounters, and demonstrated

deficiencies in medical knowledge. (*Id.*) Dr. Bassi's August 2015 evaluation reported additional deficiencies: he performed "significantly below national average" on his in-training exams, failed to timely complete medical charting, and struggled to "gather[ ] appropriate information and develop[ ] evidence-based management plans." (*Id.* at Ex. 7.) "Overall," the evaluation concluded, Dr. Bassi "is a kind physician who can improve." (*Id.*) These "areas for improvement include overall academic performance, affect-management and self care, including seeking appropriate support as needed." (*Id.*) On September 4, 2015, the CCC placed Dr. Bassi on an academic action plan. (Phelps 56.1 at ¶ 71.)

### C. Dr. Bassi's First PGY-2 Year (2015–16)

Although the CCC acknowledged Dr. Bassi's improvement when it reassessed his performance on October 16, 2015 (Keil Dec. Ex. 8), Dr. Bassi continued to receive constructive feedback during the first half of his PGY-2 year. For example, a November 14, 2015 ambulatory evaluation gave Dr. Bassi a range of "fair" to "excellent" marks on his sessions, noting that Dr. Bassi was "open and willing to accept feedback" but needed to better incorporate prior feedback, timely "follow up and appropriately address[ ] lab results," and conduct "full" exams to "demonstrate" he is "ruling out" certain diagnoses. (*Id.* at Ex. 9.) In addition, on January 22, 2016, the CCC advised Dr. Bassi to obtain a neuropsychological evaluation to help him "learn, retain, generalize, and apply information" in a clinical setting. (*Id.* at Ex. 15.) The CCC also advised Dr. Bassi to seek resources that would help him "navigate and manage [his] anxiety" that "seem[ed] to interfere" with his performance at the Clinic. (*Id.*) The CCC expressed that "severe concerns persist regarding [Dr. Bassi's] medical knowledge and application." (*Id.*) By that time, Dr. Bassi had known for over two months that the Program might not renew his contract for the PGY-3 year. (*Id.* at Ex. 10.)

On or about January 21, 2016, Chief Resident Thomas Chattahil informed Dr. Bassi that the Core Faculty believed his performance was unsatisfactory and that he looked unprofessional when wearing only his patka.  (Plaintiff's Rule 56.1 Counterstatement ("Plf. Counter") at ¶ 22.) Dr. Harkisoon had told the Core Faculty as early as Dr. Bassi's PGY-1 year that Dr. Bassi looked like a "thug" when he wore the patka.  (*Id.* at ¶¶ 22–24.)  In response to those comments, Dr. Rachna Kaul confronted Dr. Harkisoon and reminded her that Dr. Bassi's patka was an appropriate head covering.  (*Id.* at ¶¶ 25–26.)  When Dr. Bassi learned of Dr. Harkisoon's comments, Dr. Bassi filed a formal complaint with Open Door and Phelps's Human Resources Departments.  (*Id.* at ¶ 27.)  Upon learning of Dr. Bassi's complaint, his faculty adviser Mary Rose Puthiyamadam told him, "You just made things worse for yourself." (*Id.* at ¶ 28.)  On January 28, 2016, Dr. Kaul sent an email to Lindsey Farrell, President and CEO of Open Door, informing Ms. Farrell that Dr. Harkisoon had "been harassing [Dr. Bassi] for multiple different reasons since the day he arrived" and had "threatened" to "terminate him" "multiple times."  (*Id.* at ¶¶ 30–31.)  Dr. Bassi, Dr. Harkisoon, and Human Resources representatives met that same day.  (*Id.* at ¶ 32.)  At the meeting, Dr. Harkisoon apologized (Phelps 56.1 at ¶ 87), acknowledged that Dr. Bassi could wear any religious articles he wished (*id.* at ¶ 88), invited (but did not mandate) Dr. Bassi to educate his peers about his religious practices (*id.* at ¶ 89–90), and encouraged Dr. Bassi to raise any future concerns (*id.* at ¶ 91).  Dr. Harkisoon did not make any further comments regarding Dr. Bassi's religion.[1]  (*Id.* at ¶ 92.)

Dr. Bassi continued to receive negative performance reviews during the second half of his PGY-2 year.  In a February 4, 2016 ambulatory evaluation, Dr. Rebecca Collins observed that Dr.

---

[1] Plaintiff disputes this fact, but Plaintiff does so by reference to comments he asserts were made during Plaintiff's PGY-1 year. (*See, e.g.*, Plf. Resp. 56.1 Phelps at ¶ 93.)  Plaintiff provides no evidence Dr. Harkisoon continued to make comments about Plaintiff's religion after the January 28, 2016 meeting.

Bassi was "not at the level that is expected in his clinical care or that of his peers," further concluding that he struggled with "multiple levels of the [patient] encounter." (Keil Ex. 16.)  Dr. Collins also commented that she had to "reassign [Dr. Bassi's] patients to other providers" and harbored concerns about Dr. Bassi's "medical knowledge." (*Id.*)  On February 12, 2016, the CCC again warned Dr. Bassi of his potential termination from the Program and placed him on another remediation plan. (*Id.* at Ex. 17.)  In a February 29, 2016 evaluation, Dr. Collins reported that Dr. Bassi saw only four patients during the entire clinical session and failed to ask patients basic questions related to their diagnoses. (*Id.* at Ex. 18.)  Dr. Collins identified several "areas of concern," including "incomplete histories," "inadequate medical knowledge on common illnesses," and "incomplete documentation." (*Id.*)  Dr. Samantha Rai noted in a March 1, 2016 evaluation that Dr. Bassi did not "demonstrat[e] medical knowledge" requisite with his level of training and required "intervention" during "most" of his patient encounters. (*Id.* at Ex. 19.)  Dr. Bassi's March 2016 summative evaluation followed, in which Dr. Puthiyamadam identified a lack of improvement and questioned Dr. Bassi's competence "to see patients independently." (*Id.* at Ex. 22.)  As such, the CCC extended Dr. Bassi's remediation until June 2016, citing a failure to improve. (*Id.* at Ex. 23.)

### D. Dr. Bassi's Second PGY-2 Year (2016–17)

On June 17, 2016, the CCC sent Dr. Bassi a "Notice of Termination." (*Id.* at Ex. 26.)  The CCC placed Dr. Bassi on academic probation and decided not to promote Dr. Bassi to PGY-3. (*Id.*)  It warned Dr. Bassi that the Program would terminate Dr. Bassi's employment on December 31, 2016 if he did not meet the expectations of his remediation plan. (*Id.*)  The remediation plan required Dr. Bassi to, among other things, (1) provide "safe, independent patient care (with supervision immediately available) at a rate of 6-8 patients per half day session," (2)

"[d]emonstrate knowledge and application of sciences appropriate to PGY-2 level of training," (3) "[d]emonstrate ongoing initiative in learning and improvement in all ACGME competencies," and (4) "[m]aintain communication regarding expectations/assignments." (*Id.*) Dr. Bassi appealed the CCC's decision.  (Phelps 56.1 at ¶ 115.)

The Appeals Committee, which is comprised of three uninvolved members of the medical staff, upheld the CCC's decision to not promote Dr. Bassi to PGY-3.  (Keil Dec. Exs. 27, 28.)  On the one hand, the Appeals Committee found Dr. Bassi had "demonstrated deficiencies with regards to his PGY-2 performance" and "failed to meet expectations of the PGY-2 level of training." (*Id.* at Ex. 28.)  These deficiencies justified denying Dr. Bassi's promotion.  On the other hand, the Appeals Committee observed Dr. Bassi's "positive attitude," "expressed willingness to learn," "desire to become a physician," and "several" examples of "praiseworthy care" and "patient interactions." (*Id.*)  As such, the Appeals Committee recommended Dr. Bassi repeat PGY-2 rather than face termination on December 31, 2016.  (*Id.*)  The Program accepted the Appeals Committee's recommendation, extending Dr. Bassi's contract through the remainder of the 2016–17 academic year.  (*Id.* at Ex. 29.)  Consistent with the Appeals Committee's acknowledgement that "increased supervision" would be necessary to "help [Dr. Bassi] succeed" (*id.* at Ex. 28), the Program placed Dr. Bassi on the same remediation plan included in the Notice of Termination. (*Id.* at Ex. 29.)

Dr. Bassi, unfortunately, continued to receive negative evaluations.  Dr. Sara Paul, Dr. Bassi's adviser at the time (Phelps 56.1 at ¶ 121), reported a February 2017 patient visit in which Dr. Bassi made an incorrect diagnosis and included no findings to support his suggested diagnosis. (Keil Dec. Ex. 30.)  Dr. Paul, however, also reported on another encounter in which Dr. Bassi "did an excellent job" treating a "very challenging patient."  (*Id.*)  On March 1, 2017, Dr. Rebecca

McAteer observed that Dr. Bassi "has not consistently demonstrated a[ ] systematic/algorithmic approach to patient care that follows the necessary rigorous, differential-driven, analytic process of obtaining subjective content from patient histories." (*Id.* at Ex. 31.)  Dr. McAteer further commented that Dr. Bassi was "unable to organize his thoughts and approach sufficiently to complete the . . . patient care process, a requirement for any medical clinician to have mastered, in a timely fashion." (*Id.*)  Dr. Samantha Rai recorded a patient visit that same month in which Dr. Bassi needed repeated prompting to ask questions related to aspects of that patient's history. (*Id.* at Ex. 32.)  Dr. London Muse expressed concerns regarding Dr. Bassi's application of medical knowledge when assessing his patients. (*Id.* at Ex. 33.)  She added that he failed to properly document patient visits and craft appropriate treatment plans. (*Id.*)  The April 2017 summative evaluation reinforced these critiques:  despite the fact that "maximum resources" were invested to "support" his "learning and training," Dr. Bassi could not "concisely, clearly and accurately assess, treat, present and educate" his patients. (*Id.* at Ex. 34.)  The CCC thus concluded Dr. Bassi did not meet the required level of competency to advance to PGY-3. (*Id.*)

On June 2, 2017, the CCC held a pre-termination hearing regarding Dr. Bassi's dismissal from the Program (*id.* at Ex. 35), and on June 9, 2017, Dr. Bassi received a formal Notice of Termination (*id.* at Ex. 36).  The Notice identified specific performance deficiencies.  With respect to "[p]atient care," Dr. Bassi was unable to "consistently gather appropriate data from patients," "accurately summarize and record" that data, and "synthesize that data into an appropriate assessment and plan." (*Id.*)  Dr. Bassi displayed "significant improvement in in-training exam performance and some improvement in maintaining a learning portfolio," but he struggled to "apply knowledge appropriately" and "independently" "as expected at PGY-2 level of training." (*Id.*)  In addition, despite "having 22 DVDs of patient encounters," "at least 36 1:1 precepted clinic

sessions" "totaling well over 100 hours," and over a dozen adviser meetings, Dr. Bassi "continue[d] to require the same level of preceptor guidance." (*Id.*)  Lastly, although Dr. Bassi showed "much improvement" in displaying "professionalism," he "require[d] biweekly reminders to consistently respond to emails, sign evaluations, complete required documentation[,] and maintain learning portfolio."   (*Id.*)  In view of Dr. Bassi's performance deficiencies, the CCC decided to terminate Dr. Bassi's employment effective June 30, 2017.  (*Id.*)  Dr. Bassi appealed the CCC's decision to the same panel that ruled on his prior appeal.  (Phelps 56.1 at ¶ 131.)

The Appeals Committee reinstated Dr. Bassi "to complete any outstanding rotations needed to finish his training." (Keil Dec. Ex. 38.)  The Committee directed Dr. Bassi to "complete these rotations in a different environment, within the larger NYMC . . . family, under supervision by other clinical faculty." (*Id.*)  The Committee found "[n]o new information" to "warrant . . . departure" from the Committee's prior ruling: Dr. Bassi had "demonstrated sufficient competency in numerous venues so as to countervail the issues which previously arose." (*Id.*)  The Committee reached its decision "without determining Dr. Bassi's claim that discrimination tainted his treatment as a resident." (*Id.*)

Nicholas Janiga, NYMC's Chief Legal Counsel, wrote to the Appeals Committee on August 30, 2017 to (1) report that Dr. Bassi had been informed of his reinstatement and would complete his outstanding rotations under supervision from a recently-hired attending physician, and (2) inform the Committee that NYMC no longer sponsored the Program.  (*Id.* at Ex. 39.)  In effect, Janiga conveyed to the Appeals Committee—and the Appeals Committee acknowledged— that the Committee "does not have the ability to place Dr. Bassi outside the [P]rogram." (*Id.* at Ex. 40.)  For that reason, the Committee revised its ruling to remove the requirement that Dr. Bassi complete his rotations in a "different environment."  (*Compare id.* at Ex. 43 *with id.* at Ex. 38.)

Instead, the Committee directed Dr. Bassi to complete his rotations "under supervision by different faculty."  (*Id.* at Ex. 43.)

The Program reinstated Dr. Bassi effective September 11, 2017, and the Program placed Dr. Bassi under new supervision from a recently-hired attending physician.  (*Id.* at Ex. 44.) Plaintiff was reinstated as a PGY-2, and he was placed on a four-month remediation plan.  (*Id.*) Dr. Bassi rejected the Program's decision to reinstate him as a PGY-2.  (Phelps 56.1 at ¶ 146.)  He now alleges he was constructively discharged.  (*Id.*)

Dr. Bassi believes the Program's decision to deny him promotion to PGY-3 is based on his religion and his complaint to Human Resources in January 2016.  (Plf. Resp. 56.1 Phelps at ¶ 147.) Dr. Bassi cites a number of reasons for his belief.  First, discriminatory comments about Dr. Bassi's headwear occurred during his PGY-1 year.  (*Id.* at ¶ 148 (citing Declaration of Rachna Kaul, M.D. ("Kaul Dec.") at ¶¶ 6–7, ECF No. 128).)  Second, residents and faculty testified that Dr. Bassi was treated differently by Core Faculty in comparison to other residents.  (*Id.* (citing Declaration of Edwin Roberts, M.D. ("Roberts Dec.") at ¶ 5, ECF No. 130; Declaration of Jessica Zaks, M.D. ("Zaks Dec.") at ¶¶ 5–8, ECF No. 131; Declaration of Heidi Mandy, M.D. ("Mandy Dec.") at ¶¶ 3–4, ECF No. 129; Declaration of Richard Strongwater, M.D. ("Strongwater Dec.") at ¶ 5, ECF No. 115; Kaul Dec. at ¶¶ 3–5, Ex. B).)  Third, Dr. Bassi received positive evaluations from evaluators who were not apart of the Core Faculty.  (*Id.* (citing First Bassi Dec. Exs. T, U; Second Declaration of Harmeetinder Bassi ("Second Bassi Dec.") at ¶¶ 8–11, 36–38, Exs. B, C, J, K, ECF No. 125; Zaks Dec. at ¶¶ 3–4; Roberts Dec. at ¶ 3; Mandry Dec. at ¶ 7; Second Declaration of Johnny Kovoor, M.D. ("Second Kovoor Dec.") at ¶¶ 6–7, Ex. B, ECF No. 127; Puthiyamadam Tr. 51:3–52:25).)  Fourth, the Appeals Committee twice rejected the CCC's attempts to terminate Dr. Bassi's contract.  (*Id.* (citing Keil Dec. Ex. 38).)  And fifth, residents and faculty testified that Dr.

Harkisoon and members of the Core Faculty retaliated against individuals who provided critical feedback about the Program. (*Id.* (citing Zaks Dec. at ¶¶ 9–13; Kaul Dec. at ¶¶ 10–12; Mandry Dec. at ¶ 6).)

## II. Procedural History

Plaintiff filed this action on August 12, 2019 alleging claims for workplace discrimination, retaliation, breach of contract, and tortious interference. (ECF No. 1.) Plaintiff filed an Amended Complaint alleging the same claims. (ECF No. 61.) Defendants each file motions for summary judgment on all claims, and Plaintiff files a cross-motion for partial summary judgment on its breach of contract and tortious interference claims.[2]

## LEGAL STANDARDS

## I. Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment must be granted if "there is no genuine issue of material fact and ... the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 n. 4 (1986). "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the

---

[2] All motions were fully briefed as of June 2, 2022. (Open Door Motion for Summary Judgment, ECF No. 100; Open Door Memorandum of Law in Support of Open Door's Motion for Summary Judgment ("Open Door Mem."), ECF No. 102; Phelps Motion for Summary Judgment, ECF No. 104; Phelps Memorandum of Law in Support of Phelps's Motion for Summary Judgment ("Phelps Mem."), ECF No. 105; NYMC Motion for Summary Judgment, ECF No. 107; NYMC Memorandum of Law in Support of NYMC's Motion for Summary Judgment ("Phelps Mem."), ECF No. 108; Plaintiff's Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment ("Plf. Opp."), ECF No. 117; Open Door Reply Memorandum of Law in Further Support of Open Door's Motion for Summary Judgment ("Open Door Reply"), ECF No. 134; Phelps Reply Memorandum of Law in Further Support of Phelps's Motion for Summary Judgment ("Phelps Reply"), ECF No. 137; NYMC Reply Memorandum of Law in Further Support of NYMC's Motion for Summary Judgment ("NYMC Reply"), ECF No. 136; Plaintiff's Cross-Motion for Summary Judgment, ECF No. 111; Plaintiff's Memorandum of Law in Support of Plaintiff's Cross-Motion for Summary Judgment ("Plf. Mem."), ECF No. 146; Open Door's Memorandum of Law in Opposition to Plaintiff's Cross-Motion for Summary Judgment ("Open Door Opp."), ECF No. 119; Phelps's Memorandum of Law in Opposition to Plaintiff's Cross-Motion for Summary Judgment ("Phelps Opp."), ECF No. 117; Plaintiff's Reply Memorandum in Further Support of Plaintiff's Cross-Motion for Summary Judgment ("Plf. Reply"), ECF No. 141.)

applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 5 (2d Cir. 1999) (internal quotations and citations omitted).  In order to prove that a genuine issue of material fact exists, a plaintiff "may not rest upon the mere allegations or denials of the pleading[s]," but must by affidavit or otherwise "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  "Conclusory statements, conjecture or speculation by the party resisting the motion will not defeat summary judgment."  *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).

Courts must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party.  *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998).  The moving party bears the initial burden of demonstrating an absence of genuine issues of material fact.  *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997).  If the initial burden is met, the non-moving party "must produce specific facts indicating that a genuine issue of fact exists.  If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted."  *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (internal quotations and citations omitted) (alteration in original).

The same standard of review applies when the Court is faced with cross-motions for summary judgment, as here.  *See Lauria v. Heffernan*, 607 F. Supp. 2d 403, 407 (E.D.N.Y. 2009) (citations omitted).  When evaluating cross-motions for summary judgment, the Court reviews each party's motion on its own merits, and draws all reasonable inferences against the party whose motion is under consideration.  *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

## II.    Federal and State Workplace Discrimination Statutes

Section 1981 guarantees "[a]ll persons within the jurisdiction of the United States . . . the same right . . . to the full and equal benefit of all laws and proceedings . . . as is enjoyed by white

citizens." 42 U.S.C. § 1981. In effect, Section 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 224 (2d Cir. 2004).

Title VII, meanwhile, prohibits any employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

New York State Human Rights Law ("NYSHRL") "mirrors" these federal protections. *Brown v. Daikin Am., Inc.*, 756 F.3d 219, 226 (2d Cir. 2014).

Courts analyze discrimination claims brought under Section 1981, Title VII, and the NYSHRL using the burden-shifting analysis articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010) (Section 1981); *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (Title VII); *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (NYSHRL).

Under the *McDonnell Douglas* framework, the plaintiff must establish a prima facie case. 411 U.S. at 802. To establish a prima facie case of either gender or age discrimination, a plaintiff must demonstrate that "(1) [they were] within the protected class; (2) [they were] qualified for the position; (3) [they were] subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Liebowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009).

The plaintiff's burden at this stage is "minimal" or "de minimis." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (describing burden for discrimination claims); *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (describing burden for retaliation claims). However, a plaintiff must establish all four elements of the prima facie case before

proceeding with the next step of the *McDonnell Douglas* framework. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311–12 (1996) ("As the very name 'prima facie case' suggests, there must be at least a logical connection between each element of the prima facie case and the illegal discrimination for which it establishes a 'legally mandatory, rebuttable presumption[.]'" (citations omitted)).

Once a plaintiff has made a prima facie case, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802. In other words, "[t]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal quotation marks and emphasis omitted).

Upon the defendant's proffer of a non-discriminatory reason, the presumption of discrimination arising with the prima facie case "drops from the picture," *Weinstock*, 224 F.3d at 42 (citing *Hicks*, 509 U.S. at 510–11), and the "final and ultimate burden" then returns to the plaintiff to demonstrate that defendant's reason is in fact a pretext for unlawful discrimination. *See McDonnell Douglas*, 411 U.S. at 804; *Weinstock*, 224 F.3d at 42. The plaintiff must "produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not the discrimination was the real reason for the employment action." *Weinstock*, 224 F.3d at 42 (internal quotation marks omitted) (citation omitted).  Alternatively, a plaintiff may meet its final burden by relying on direct or indirect evidence demonstrating that "an impermissible reason was a motivating factor, without proving that the employer's proffered explanation played no role in its conduct." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 81 (2d Cir. 2001) (internal quotations

omitted). "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." *Weinstock*, 224 F.3d at 42.

In addition, regarding employment retaliation claims, Title VII protects "the filing of formal charges of discrimination . . . as well informal protests of discriminatory employment practices." *Littlejohn v. City of New York*, 795 F.3d 297, 317 (2d Cir. 2015) (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)); *see Natofsky v. City of New York*, 921 F.3d 337, 354 (2d Cir. 2019) ("Protected activity is action taken to protest or oppose statutorily prohibited discrimination.") (quotation marks omitted).   A plaintiff bringing employment retaliation claims advances under the same *McDonnell Douglas* burden-shifting framework used for underlying discrimination claims.  *See Littlejohn*, 795 F.3d at 315 (Section 1981 and Title VII); *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (NYSHRL).  To state a prima facie retaliation claim under Section 1981, Title VII, and the NYSHRL, a plaintiff must show "(1) [plaintiff] engaged in a protected activity; (2) [the] employer was aware of this activity; (3) the employer took adverse employment action against [plaintiff]; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Summa*, 708 F.3d at 125 (Title VII and NYSHRL); *accord Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (Section 1981).  Section 1981 and Title VII claims "must be proved according to traditional principles of but-for causation, which requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Maynard v. Montefiore Med. Ctr.*, No. 18-CV-8877 (LAP), 2021 WL 396700, at *6 (S.D.N.Y. Feb. 4, 2021) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) and *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020)).  The same standard applies to

retaliation claims under the NYSHRL. *Id.* (citing *Smith v. N.Y. & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 340 n.22 (S.D.N.Y. 2020) (collecting cases)).

The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent. At the same time, . . . the salutary purposes of summary judgment—avoiding protracted and harassing trials apply no less to discrimination cases than to other areas of litigation." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (quotation marks, citations, and alterations omitted). As in any other case, a plaintiff in an employment discrimination or retaliation case "must 'do more than simply show that there is some metaphysical doubt as to the material facts.' She must come forth with evidence sufficient to allow a reasonable jury to find in her favor." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal citations omitted).

## DISCUSSION

## I.    Discrimination Claims (Counts I-III)

The Court first assesses whether Plaintiff has established a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Plaintiff alleges discrimination on the basis of his race and religion.[3]  (Am. Compl. at ¶¶ 119, 125, 133, 140, 145, 152.) The parties dispute whether the Plaintiff was qualified to receive a promotion to PGY-3, whether Plaintiff's denial of promotion constituted an "adverse action," and whether the adverse

---

[3] Because Sikhism is a religion "developed specifically among the people hailing from the Punjab region of the Indian Subcontinent" (Plf. Opp. at 28), this Court construes Plaintiff's claims to encompass both race-based and religion-based discrimination. *See Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987) (concluding Congress passed Section 1981 with the intent to "protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their *ancestry or ethnic characteristics*") (emphasis added).

action occurred under circumstances giving rise to an inference of discrimination on the basis of Plaintiff's race or religion.

This Court, however, need not resolve these disputes. Instead, as Second Circuit caselaw "makes clear," this Court may simply assume that a plaintiff has established a prima facie case and skip to the final step in the *McDonnell Douglas* analysis, as long as the employer has articulated a legitimate, nondiscriminatory reason for the adverse employment action." *Howard v. MTA Metro-N. Commuter R.R.*, 866 F. Supp. 2d 196, 205 (S.D.N.Y. 2011) (collecting cases) (citing *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 188 (2d Cir. 2006)). The Court need not assess the credibility of the evidence proffered; it must decide whether defendants have "introduced evidence that, 'taken as true, would permit the conclusion that there was a nondiscriminatory reason.'" *See Lyons v. New York, Div. of Police*, No. 15 CIV. 3669 (NSR), 2020 WL 2857157, at *10 (S.D.N.Y. June 2, 2020), *on reconsideration in part sub nom. Lyons v. New York*, No. 15 CIV. 3669 (NSR), 2021 WL 1226957 (S.D.N.Y. Mar. 31, 2021). Once defendants articulate a non-discriminatory reason, the burden shifts back to the plaintiff to demonstrate that the alleged reason for the adverse employment decision was pretextual. *See Cooper v. Connecticut Public Defenders Office*, 280 Fed. Appx. 24, 25 (2d. Cir. 2008).

Defendants have plainly "articulated a legitimate, non-discriminatory reason" for denying Plaintiff promotion to PGY-3: Plaintiff's deficient clinical performance. *Dixon v. Int'l Fed'n of Accts.*, 416 F. App'x 107, 110 (2d Cir. 2011) ("Even assuming *arguendo* that Dixon could establish a *prima facie* case, the record overwhelmingly demonstrates that IFAC had a legitimate, non-discriminatory reason for terminating Dixon—namely, her deficient work performance."). The record is replete with documentation of Plaintiff's deficient clinical performance. (*See, e.g.,* Keil Dec. Exs. 6, 7, 8, 9, 15, 16, 18, 19, 22, 30, 31, 32, 33, 34.) Plaintiff received several negative

evaluations of his clinical performance from multiple instructors across a three-year period of time, with each evaluation addressing the same series of flaws: Plaintiff was unable to safely and independently apply his medical knowledge to appropriately diagnose and develop treatment plans for patients in a clinical setting. (*See, e.g., id.*) In sum, despite receiving additional supervision, Plaintiff failed to "concisely, clearly and accurately assess, treat, present and educate" his patients. (*See id.* at Ex. 34.) The burden thus shifts to Plaintiff to show that Defendants' justification is pretextual. *See McDonnell Douglas*, 411 U.S. at 804.

Plaintiff can do so "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Ibrahim v. N.Y. State Dep't of Health*, 904 F.2d 161, 166 (2d Cir. 1990). Plaintiff argues Defendants' claim of Plaintiff's deficient performance is pretext for two primary reasons: (1) Defendants' evaluation of Plaintiff's performance is "contradicted by [Defendants'] own faculty, residents, and appeals committee" (Plf. Opp. at 20–23); and (2) "[D]efendants repeatedly ignored their own program requirements and standards in both how they supervised and evaluated plaintiff" (*id.* at 24–26).[4] The Court addresses each argument in turn.

Plaintiff first avers that the evaluations of faculty, fellow residents, and the Appeals Committee contradict Defendants' contention that Plaintiff exhibited deficient performance. (*Id.* at 20–23.) Plaintiff argues he received "outstanding reviews" from rotation faculty, which Plaintiff contends is important because residents "spend significantly more time in rotations than they do in the Open Door Clinic." (*Id.* at 20.) Defendants disregard this evidence, argues Plaintiff. One

---

[4] Plaintiff also argues this Court must disregard testimony from Dr. Harkisoon and the Core Faculty. (Plf. Opp. at 26–27.) Although this Court does not rely upon their testimony, it also notes that considering the testimony of an "interested witness" does not necessarily preclude a grant of summary judgment, especially where that testimony is "uncontradicted and unimpeached." *Chiaramonte v. Animal Med. Ctr.*, 677 F. App'x 689, 693 (2d Cir. 2017) (affirming grant of summary judgment even where lower court relied upon testimony of "interested witness").

example is the evaluation of Dr. Kovoor.  Dr. Kovoor supervised Plaintiff in an off-site family medicine rotation, and he reported to the CCC that Plaintiff "had performed well, met all the necessary competencies, and ought to be promoted to PGY-3."  (*Id.* at 21 (citing Second Kovoor Dec. Ex. B).)  Plaintiff also received positive feedback from attending physicians, senior residents, and his academic adviser.  (*Id.* at 21–22.)  In addition, Plaintiff took the National In-Training Examination in October 2016 and scored higher than any other resident in the Program that year.  (*Id.* at 22.)  Lastly, Plaintiff contends Defendants' assessment of Plaintiff's performance was twice rejected by the Appeals Committee, which reinstated Plaintiff and directed Plaintiff to complete his residency under different supervision.  (*Id.* at 23.)

Although Plaintiff has demonstrated competency in several rotations outside of the Clinic, earned the respect of his peers, and achieved high marks in the National In-Training Examination, Plaintiff has failed to proffer evidence to support a finding that the various evaluations performed by Core Faculty members were uncredible, and more likely than not, that discrimination was the real reason for the poor assessments resulting in his subsequent failure to be promoted in the Program.  At the outset, the Appeals Committee found on November 23, 2016 that Plaintiff had "demonstrated deficiencies with regards to his PGY-2 performance" and "failed to meet expectations of the PGY-2 level of training."  (Keil Dec. Ex. 28.)  In its decision dated August 9, 2017, the Appeals Committee—contrary to Plaintiff's argument otherwise—did not back down from its prior findings.  Instead, the Committee explained that it found "[n]o *new* information" to "warrant . . . departure" from its prior ruling.  (*Id.* at Ex. 38 (emphasis added).)  Although the Committee found Plaintiff had shown "sufficient competency in numerous venues so as to

countervail the issues which previously arose," the Committee did not explicitly direct the CCC to promote Plaintiff to PGY-3.  (*Id.*)

Plaintiff's positive feedback and test scores are commendable, but they do not show Plaintiff's religion "more likely motivated the employer" to deny Plaintiff's promotion than other non-discriminatory reasons or that the CCC's evaluations of Plaintiff were "unworthy of credence."  *Ibrahim*, 904 F.2d at 166.  The positive feedback, at best, demonstrates (1) Plaintiff showed competencies in various Family Medicine specialty rotations; (2) Plaintiff possessed sufficient medical knowledge to execute well on a standardized test; and (3) some physicians, such as Dr. Kovoor,[5] and residents observed Plaintiff perform well in a clinical setting.  This feedback, however, does not undermine the CCC's reason for denying Plaintiff's promotion: in the judgment of the physicians tasked with daily supervising Plaintiff's clinical performance,[6] Plaintiff was unable "concisely, clearly and accurately assess, treat, present and educate" his patients.  (Keil Dec. Ex. 34.)  In other words, the CCC could not trust Plaintiff to *consistently* treat patients in a safe, independent, and timely manner commensurate with the expected performance of a PGY-3 resident.  At base, Plaintiff asks this Court to substitute its judgment for that of numerous faculty members—all of whom possess more experience in family medicine than this Court—who documented Plaintiff's performance deficiencies in numerous written evaluations over a period of three years.  *See, e.g., Abdel-Raouf v. Yale University*, 2015 WL 687440, at *3 (D.Conn. Feb. 18, 2015) (collecting cases) (noting "unusual character of a residency training program" and thus

---

[5] Dr. Johnny Kovoor is a family medicine practiner who supervised Plaintiff during a six-week offsite rotation.  Dr. Kovoor believed Plaintiff did an "outstanding job."  (Second Kovoor Dec. at ¶ 6.)

[6] The Program was not obligated to consult the evaluations of outside physicians, such as Dr. Kovoor.  As stated in Section VIII.5 of the Handbook, the "Program Director may, at his or her discretion, consult with outside faculty who interact to a significant extent with the resident."

acknowledging "judges and juries are singularly unequipped to review judgments about professional qualification"). This Court is without authority to do so.

Plaintiff next argues that Defendants "repeatedly ignored their own program requirements and standards in both how they supervised and evaluated plaintiff." (Plf. Opp. at 24.) Plaintiff observes that although "one of defendants' major criticisms of plaintiff's performance was that he was unable to safely see a sufficient number of patients in the clinic," Defendants gave Plaintiff "different instructions" as to how to use his time during patient visits. (*Id.*) Plaintiff also claims Defendants videotaped his patient visits "not for the purpose of assisting plaintiff, but rather to gather evidence against him." (*Id.* at 24–25) Lastly, Plaintiff contends Defendants "repeatedly violated the provisions" of the Program's handbook. (*Id.* at 25–26.) In particular, Plaintiff asserts (1) the Program "tried to terminate plaintiff on three separate occasions without giving the appropriate notice of termination" (*id.* at 25), (2) the Program denied Plaintiff academic credit for rotations he passed (*id.* at 26), and (3) the Program "refused to implement the decision of its own appeals committee" (*id.*). In sum, Plaintiff argues "these repeated violations of policy to the detriment of plaintiff were motivated by discrimination." (*Id.*)

These purported procedural deficiencies do not establish pretext because none of them show Plaintiff's religion "more likely motivated the employer" to deny Plaintiff's promotion than other non-discriminatory reasons or that the CCC's evaluations of Plaintiff were "unworthy of credence." *Ibrahim*, 904 F.2d at 166. Plaintiff was scheduled to see one patient per hour—the same time given to a PGY-1 resident—and the differing instructions of Core Faculty did not prevent Plaintiff from treating patients at that rate. (Second Bassi Dec. at ¶ 40.) Instead, different Core Faculty members simply had differing views on how Plaintiff could best use his time to meet two of Plaintiff's obligations: appropriately diagnosing patients and timely completing medical

notes.  (*Id.* at ¶¶ 40–41.)  Whether members of the Core Faculty gave different advice to Plaintiff is far afield from evidence of discrimination; if anything, Plaintiff's argument merely proves members of the Core Faculty took an interest in Plaintiff's education and suggested advice for improvement.

Plaintiff also distorts testimony related to videotaping.  Citing to the deposition of Richard McCarrick, NYMC's designated institutional officer, Plaintiff argues the Program "began taping because once plaintiff made a complaint of discrimination, recordings could be used as evidence of a 'consensus' of plaintiff's deficiencies."  (Plf. Opp. at 25 (citing McCarrick Tr. 97:14-98:20).)  But Mr. McCarrick attested to something much different.  He testifies that every resident is videotaped for the purpose of training.  (McCarrick Tr. 97:6-10.)  In the case of Plaintiff, the videotapes served an additional purpose: providing a prophylactic layer of review to ensure Plaintiff's fate would not be determined "only by an individual supervisor" but rather "by some kind of consensus of additional faculty members."  (*Id.* at 97:20-98:2.)  In other words, although the purpose of the videotapes was to serve as an "educational tool" (*id.* at 97:6-10), in Plaintiff's case the videotapes also served as a backstop for the CCC to ensure it did not make any decisions regarding Plaintiff's future without appropriate documentary evidence.  If anything, the videotapes show Defendants were concerned with making unanimous, evaluative decisions based only on credible, documented evidence and not the "opinion of a single supervisor."  (*Id.* at 98:15-20.)

Plaintiff also fails to establish the Program "repeatedly violated the provisions of its own handbook."  (Plf. at 25.)  Contrary to Plaintiff's argument, Plaintiff was notified on November 13, 2015 that the Program might not promote Plaintiff to PGY-3 (Keil Dec. Ex. 10)—well before the February 1st deadline purportedly required by the Resident Handbook—and the Program thrice extended Plaintiff additional time (first to February 2016, second to April, and third to June) to

show improvement prior to the termination of his tenure.  (*Id.* at Exs. 11, 17, 23.)  Plaintiff was given similar notice the next year.  (*Id.* at Exs. 26, 29.)  On December 19, 2016, the CCC accepted the ruling of the Appeals Committee to reinstate Plaintiff as PGY-2, and in doing so, it notified Plaintiff that the Program might not promote Plaintiff to PGY-3 should Plaintiff not show improvement by the time of his March 2017 evaluation.  (*Id.* at Ex. 29.)  During the 2015–16 and 2016–17 school years, the Program put Plaintiff on clear notice that the Program would deny Plaintiff promotion to PGY-3 should he fail to meet performance expectations by a specified date (April 2016 and March 2017, respectively).  (*Id.* at Exs. 17, 29.)  To the extent Plaintiff did not know *with certainty* by February 1st that the Program would deny him promotion, Plaintiff was receiving the benefit of additional time beyond February 1st to earn promotion.  Far from establishing pretext, Plaintiff's argument shows Defendants afforded greater notice than required by the Resident Handbook.

Plaintiff likewise cannot show Defendants' denial of credit evinces discriminatory intent or otherwise renders uncredible Defendants' evaluations of Plaintiff.  Plaintiff again refers to the Resident Handbook, this time to attempt to establish that he is entitled to credit for rotations successfully completed.  (Plf. Opp. at 26.)  The Resident Handbook outlines the minimum performance metrics a resident must obtain to achieve promotion.  (Handbook at Sec. VIII.2.)  To that end, the Handbook requires residents to successfully complete rotations and undergo remediation with respect to any unsuccessful rotations.  (*Id.*)  The Handbook, however, does not entitle Plaintiff to "credit" for successfully completed rotations; in fact, "credit" is a word nowhere to be found in Section VIII of the Handbook.  (*See generally id.* at Sec. VIII.)  Whether Plaintiff receives "credit" for a successfully completed course is an academic determination, and the CCC determined—based on the evaluations of several different physicians across three years—that

Plaintiff did not possess the competencies necessary for promotion to PGY-3.  *See, e.g., Abdel-Raouf*, 2015 WL 687440, at *3.  By granting Plaintiff some credit for PGY-2, Defendants were, in effect, making an academic determination as to how far Plaintiff was from being promoted to PGY-3: Plaintiff had not successfully completed PGY-2, but Plaintiff still demonstrated some competency in particular areas so as to not require him to repeat all of the PGY-2 rotations again. (*See, e.g.,* First Bassi Dec. Ex. V (May 9, 2017 email from S. Harkisoon to L. Muse: "[H]ow many months would the CCC say Dr. Bassi requires to achieve PGY-3 level performance in ambulatory medicine – let this guide how much credit he can receive for PGY-2.  Based on experience, would he need an entire year, potentially more or less?").)  Even if Defendants incorrectly denied Plaintiff credit, Plaintiff has offered no evidence to suggest Defendants were motivated by any intent other than to accurately assess how much training Plaintiff needed to achieve promotion to PGY-3. Indeed, if Defendants were motivated by discriminatory intent, one would expect Defendants to have denied Plaintiff credit entirely.

Defendants' alleged refusal to implement the decision of the Appeals Committee does not establish pretext either.  That is because the Appeals Committee was "charged with determining the validity of [Plaintiff's] termination" (First Bassi Dec. at Ex. R), and Plaintiff has produced no evidence to suggest the Committee reinstated Plaintiff at PGY-3 or otherwise directed the CCC's decision to place Plaintiff on probation upon reinstatement.  The plain language of the Committee's decision merely overrules the CCC's termination of Plaintiff's residency and permits Plaintiff to continue his training under the supervision of new faculty with the possibility that he would improve in areas of deficiency.  (Keil Dec. Ex. 43.)  Nothing in the record suggests the Program disregarded the decision of the Appeals Committee, let alone did so with discriminatory intent. *See Bourara v. New York Hotel Trades Council & Hotel Ass'n of New York City*, *Inc. Emp. Benefit*

*Funds*, No. 17CV7895 (DF), 2020 WL 5209779, at *12–13 (S.D.N.Y. Sept. 1, 2020), aff'd, No. 20-3092, 2021 WL 4851384 (2d Cir. Oct. 19, 2021) (finding no evidence of pretext where defendant allegedly "failed to follow its own policies and procedures in terminating [plaintiff's] employment" because plaintiff could not show "application of the policy was a pretext for discrimination").

Accordingly, this Court finds no genuine dispute of material fact exists: Plaintiff fails to demonstrate that Defendants' legitimate, non-discriminatory reasons for denying him promotion were pretextual.  Accordingly, the Court dismisses with prejudice Plaintiff's discrimination claims (Counts I–III).

## II.     Retaliation Claims (Counts I, II, IV)

Like the discrimination claims addressed above, this Court begins by asking whether Plaintiff has established a prima facie case.  As previously discussed, to state a prima facie retaliation claim under Section 1981, Title VII, and the NYSHRL, a plaintiff must show "(1) [plaintiff] engaged in a protected activity; (2) [the] employer was aware of this activity; (3) the employer took adverse employment action against [plaintiff]; and (4) a causal connection exists between the alleged adverse action and the protected activity."  *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (Title VII and NYSHRL); *accord Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (Section 1981).

Here, the Court finds that Plaintiff has failed to demonstrate a causal connection between the alleged adverse action and protected activity.  The evidence demonstrates that Defendants denied Plaintiff promotion to PGY-3 based on the unanimous decisions of the CCC.  (Phelps 56.1 at ¶ 97.)  Plaintiff counters that Dr. Puthiyamadam, Plaintiff's one-time adviser, "never rated Bassi below 'good' in her evaluations."  (Plf. Resp. 56.1 Phelps at ¶ 97.)  Plaintiff also avers that "[t]here

is no evidence of how decisions by the CCC are reached, and the CCC lacks minutes or records of meetings that would demonstrate its process." (*Id.*) Plaintiff, however, neglects evidence suggesting Dr. Puthiyamadam had reservations about Plaintiff's clinical performance. (Keil Dec. Ex. 22 (March 2016 Summative Evaluation, authored by Dr. Puthiyamadam: "Dr. Bassi has not demonstrated improvement at the expected level. Despite multiple one on one precepting sessions as well as specific written feedback[,] little improvement [is] noted. There is now a concern that he is not competent to see patients independently.").) Plaintiff also neglects that the burden, albeit "de minimis," rests with him to establish his prima facie case. *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). Barring evidence that Defendants improperly withheld their meeting records, the non-existence of such records does not create a genuine dispute of material fact. Instead, the evidence in the record cuts one way: not only did the CCC identify Plaintiff's performance deficiencies several months before his complaint to HR, but also the CCC's post-complaint decisions were unanimous and no evidence was presented to suggest members of the CCC discussed the HR complaint. *See Abdel-Raouf v. Yale Univ.*, No. 3:12CV776 HBF, 2015 WL 687440, at *5 (D. Conn. Feb. 18, 2015) (citing *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)) (finding no retaliation where no evidence existed to suggest members of residency program evaluation committee "discussed [the derogatory comment] at the [evaluation] meetings"); *see also Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (finding no retaliation where "extensive period of progressive discipline" began five months before filing EEOC charges). Plaintiff fails to establish a causal

connection between his complaint to HR and subsequent denial of a promotion, and thus he fails to establish a prima facie case of retaliation.

Assuming, *arguendo*, that Plaintiff has established a prima facie case of retaliation, dismissal of the claims is still warranted. As discussed, Defendants offered legitimate, non-discriminatory reasons for denying Plaintiff's promotion, and no showing has been made by Plaintiff to establish pretext or that Plaintiff's complaint to HR was the "but-for" cause of the denial of promotion. *See, e.g., Palencar v. New York Power Auth.*, 834 F. App'x 647, 651 (2d Cir. 2020) (affirming, first, lower court's grant of summary judgment on discrimination claim because defendant had presented unrebutted legitimate, non-discriminatory reasons for adverse actions, and then summarily affirming, second, lower court's grant of summary judgment on retaliation claim because, "as noted above with respect to [plaintiff's] discrimination claims, even if we assume that [plaintiff] has established a prima facie case of retaliation, there can be no question that [defendant] proffered legitimate, non-retaliatory reasons for disciplining and ultimately terminating him"); *see also Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 70–73 (2d Cir. 2015) (affirming lower court grant of summary judgment where plaintiff failed to present sufficient evidence from which a reasonable jury could conclude "that the desire to retaliate was the but-for-cause") (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)).

Accordingly, this Court dismisses with prejudice Plaintiff's retaliation claims (Counts I, II, IV).

## III. Individual Liability (Counts V & VI)

Because this Court has found Plaintiff's underlying discrimination and retaliation claims do not withstand summary judgment, individual liability does not attach to Defendant Harkinsoon. *See, e.g., Falchenberg v. New York State Dep't of Educ.*, 338 F. App'x 11, 14 (2d Cir. 2009)

(dismissing individual liability claims arising under federal and state discrimination statutes, including NYSHRL, because "there was no underlying violation" and "aiding and abetting is only a viable theory where an underlying violation has taken place").

Accordingly, this Court dismisses with prejudice Plaintiff's individual liability claims (Counts V & VI).

## IV.    Breach of Contract (Count VII)

At the outset, Plaintiff's breach of contract claim against NYMC is dismissed with prejudice because NYMC is not a party to the contract at issue.[7]  *See, e.g., 1911 Richmond Ave. Assocs., LLC v. G.L.G. Capitol, LLC*, 933 N.Y.S.2d 899, 899 (App. Div. 2nd Dep't 2011) (affirming grant of summary judgment where moving party was not party to contract and "thus owed no contractual duty to the plaintiff").

Turning now to Plaintiff's remaining breach of contract claim against Phelps, Plaintiff claims Phelps breached the Contract by (1) "[f]ailing to give Dr. Bassi timely notification of non-promotion"; (2) "[f]ailing to give Dr. Bassi timely notification of non-renewal"; (3) "[w]ithholding academic credit for rotations that Dr. Bassi successfully passed"; (4) "[d]enying Dr. Bassi due process with respect to his non-promotion, non-renewal, appeal, and receipt of academic credit"; (5) "[i]nterfering with the deliberations and decision of the Appeals Committee"; and (6) "[r]efusing to implement either the original or improperly modified decision of the Appeals Committee."  (Am. Compl. at ¶ 160.)

For the reasons stated above, *supra* Discussion § I, and more, Plaintiff cannot recover for breach of contract because he does not raise a genuine dispute of material fact as to whether Phelps breached its obligations under the Contract (and Handbook).  *See, e.g., 34-06 73, LLC v. Seneca*

---

[7] (*See* NYMC's Statement of Material Facts in Opposition to Plaintiff's Motion for Summary Judgment at ¶¶ 89–90, ECF No. 120 (citing Residency Agreement).)

*Ins. Co.*, 39 N.Y.3d 44, 52 (2022) (listing elements of a breach of contract claim: (1) "a contract exists," (2) "plaintiff performed in accordance with the contract," (3) "defendant breached its contractual obligations," and (4) "defendant's breach resulted in damages").  At base, Plaintiff was timely notified of non-promotion and non-renewal.[8]  He was notified on November 13, 2015—well before the February 1, 2016 deadline—that the Program might not promote him to PGY-3 unless he successfully completed steps outlined in his academic action plan.  (Keil Dec. Ex. 10.) Plaintiff's opportunity to show progress in his remediation was extended from December 2015 to February 2016 (*id.* at Ex. 11), from February 2016 to April 2016 (*id.* at Ex. 17), and again from April 2016 to June 2016 (*id.* at Ex. 23).  Taking Section VIII in isolation—as Plaintiff suggests we do—the contractual language contemplates that even an *already promoted* student may be subsequently denied promotion after February 1 for failure to meet "minimum training standards." These residents would *then* be subject to remediation procedures, as governed by Section VIII.4. Because these residents would face remediation after February 1, the "specified time frame" for completing remediation would necessarily occur after February 1.  A resident's failure to successfully complete remediation would thus result in the Program informing that resident of non-promotion after February 1.  Plaintiff is no different, except Plaintiff learned—*before* February 1—of his non-promotion and steps to cure.  Moreover, to the extent Phelps's notifications were indeed inadequate—and this Court finds they are not—Phelps nonetheless extended a benefit

---

[8] Plaintiff arguably was not entitled to any notice, let alone several months-worth.  Section VIII.5 of the Handbook governs "Termination."  This section states, "Termination will ordinarily become effective not less than two weeks after receipt of the written notice."  Moreover, this section allows the Program Director to waive the notification period if the "continuance of the resident in the program during the notice period would result in a risk of danger to patients."

to Plaintiff by allowing Plaintiff additional time beyond February 1 to cure his deficient performance. (Keil Dec. Exs. 17, 23.)

Plaintiff's other alleged breaches are not well-taken. As previously explained, nothing in the Agreement or Resident Handbook entitles Plaintiff to "credit" for completed rotations. The award of credit is an academic determination, and this Court refuses to substitute its judgment for that of academic faculty. *See, e.g., Abdel-Raouf*, 2015 WL 687440, at *3. Although Plaintiff plainly completed his rotations, his performance was deemed unfit for promotion to PGY-3, and as such, the CCC determined—and the Appeals Committee did not disagree—that Plaintiff ought complete a number of PGY-2 rotations commensurate with the level of training the Program believed was necessary for promotion to PGY-3. (First Bassi Dec. Ex. V; *accord* Keil Dec. Ex. 38.) In other words, the Program did not award credit for rotations the CCC believed Plaintiff needed to retake to achieve the competencies necessary for promotion. (First Bassi Dec. Ex. V.)

The record likewise confirms Plaintiff received precisely what he seeks: "participation in a residency where he and other residents had the ability to challenge adverse decisions."[9] (Plf. Reply at 7.) To the extent the Handbook guarantees Plaintiff the same "due process" that *government* institutions are constitutionally obligated to provide, *see, e.g., Gomes*, 365 F.Supp.2d at 35, Plaintiff has not shown a violation. Plaintiff argues "the *ex parte* communications between Program representatives and the Appeals Committee resulted in a modified decision without Plaintiff's input" (Plf. Mem. at 16), but Plaintiff has not shown how these communications tainted the "integrity of the process and the fairness of the result." *Gomes*, 365 F.Supp.2d at 35 (citation omitted). At worst, Program representatives clarified to the Appeals Committee what is self-

---

[9] Plaintiff is correct that the Handbook guarantees "due process," but he does not articulate what "due process" guarantees Plaintiff in this context. Phelps is not a government institution, and Plaintiff's cited cases involve purported violations of constitutional due process by state actors. *See, e.g., Gomes v. University of Maine System*, 365 F.Supp.2d 6, 35 (D. Me. 2005).

evident: the Program could not guarantee Plaintiff placement in an outside program.  (Keil Dec. Ex. 40 (August 17, 2017 email from N. Janiga to S. Harkisoon, et al.: "The appeals committee understands that it does not have the ability to place Dr. Bassi outside this program.").)  Although Plaintiff argues the Program could have secured placement in another program (Plf. Reply at 9–10), he cannot show the Program had the authority to guarantee such placement.  Plaintiff cannot fault the Program for revising the terms of Plaintiff's reinstatement to remove a promise the Program had not the authority to guarantee.

Nor can Plaintiff suggest the appeals process generally denied him due process.  He received the benefits of the appeals process: the Appeals Committee twice overruled the CCC and reinstated Plaintiff.  (Keil Dec. Exs. 28, 38.)  Although Plaintiff is dismayed he was reinstated in PGY-2, he cannot point to anything in the Appeals Committee's decision to suggest he was in fact promoted to PGY-3.   Plaintiff argues that because the Committee found Plaintiff had "demonstrated sufficient competency in numerous venues so as to countervail the issues that previously arose," the decision "can only be read as a rejection of the CCC's determination that Plaintiff failed to meet sufficient competency" for promotion.  (Plf. Reply at 7–8 (quoting Keil Dec. Ex. 38).)  Plaintiff stretches the decision's language beyond its plain meaning.  The Appeals Committee addressed the CCC's decision to *terminate* Plaintiff—indeed, it reversed the CCC's decision—and it justified its reversal by concluding "[n]o new information was presented" to "warrant the committee's departure from its previous decision" "to reinstate Dr. Bassi."  (Keil Dec. Ex. 38.)  Put differently, the Committee found Plaintiff had "demonstrated sufficient competency" to "countervail the issues that previously arose," such that termination was inappropriate.  (*Id.*)  Plaintiff has produced no evidence to suggest the Program wrongly interpreted the Committee's decision.  This Court sees no evidence in the record, such as email correspondence with members

of the Appeals Committee, to infer the Program wrongly interpreted the Committee's decision. Without more, this Court cannot second-guess the Program's decision to reinstate Plaintiff at a level the Program believed was commensurate with Plaintiff's training.[10]  *See, e.g., Abdel-Raouf*, 2015 WL 687440, at *3.

In sum, Plaintiff cannot establish a genuine dispute of material fact as to Phelps's alleged breaches.  Accordingly, this Court dismisses with prejudice Plaintiff's breach of contract claim (Count VII).

## V.      Tortious Interference with Contract (Count VIII)

Plaintiff asserts a claim for tortious interference with contract against NYMC.  To successfully prove his claim, Dr. Bassi must show (1) "the existence of a valid contract between [Dr. Bassi] and some third party"; (2) "knowledge of that contract by [NYMC]"; (3) "[NYMC's] intentional inducement of a breach by the third party to the contract"; and (4) "damages to [Dr. Bassi] as a result of the third party's breach."  *Action Nissan, Inc. v. Nissan N. Am.*, 454 F. Supp. 2d 108, 132 (S.D.N.Y. 2006); *accord Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94 (1993) ("The tort of inducement of breach of contract . . . consists of four elements: (1) the existence of a contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and (4) damages to plaintiff.").

Because Plaintiff cannot prove an underlying breach of contract, Plaintiff's tortious interference with contract claim must fail.  *See D'Andrea v. Rafla-Demetrious*, 146 F.3d 63, 66

---

[10] Unfortunately, Plaintiff did not exhaust the appeal and grievance procedures in the Handbook—the same procedures that twice worked in Plaintiff's favor—to enforce the purported terms of the Committee's decision.  Had Plaintiff exhausted these procedures and challenged his reinstatement at PGY-2 (*see* First Bassi Dec. Ex. X (October 16, 2017 letter from K. Murray to H. Bassi: "If you wish to challenge the denial of academic credit or the [CCC's] decision to place you on a new academic probation plan upon your reinstatement, you must do so in accordance with the House Staff Rules & Procedures.")), he may have again won his appeal or, at the very least, obtained evidence to help him meet his burden of production in the present action.

(2d Cir. 1998) (affirming grant of summary judgment for tortious interference claim where lower court found no underlying breach of contract); *accord Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996) (affirming dismissal of tortious interference claim because "actual breach of contract" is an element of the claim and plaintiff failed to allege third party "in fact breached its contract").

Accordingly, this Court dismisses with prejudice Plaintiff's tortious interference with contract claim (Count VIII).

## CONCLUSION

Defendants' motions for summary judgment are GRANTED.

Plaintiff's cross-motion for summary judgment is DENIED.

Plaintiff's claims are dismissed with prejudice.

The Clerk of Court is kindly directed to terminate the motions at ECF Nos. 100, 104, 107 and 111. The Clerk of Court is also directed to enter judgment in favor of the Defendants. The Clerk of Court is further directed to close the case.

Dated:   March 2, 2023                                    SO ORDERED:
         White Plains, New York

                                                            NELSON S. ROMÁN
                                           United States District Judge